ATTORNEYS FOR APPELLANT
Kurt R. Earnst
David K. Payne
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Scott L. Barnhart
Deputy Attorney General
Indianapolis, Indiana

**FILED**

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 64S03-0912-CR-550

ARTURO GARCIA-TORRES,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Porter Superior Court, No. 64D01-0505-FB-4871
The Honorable Roger V. Bradford, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 64A03-0812-CR-630

**June 30, 2011**

**Shepard, Chief Justice.**

Arturo Garcia-Torres was convicted of rape, attempted rape, and two counts of burglary and was sentenced to thirty-six years in prison. Garcia-Torres challenges the use of DNA evidence gathered when police obtained a cheek swab. The parties having passed over the question whether the swab was a search requiring separate probable cause, we analyze the issue under ordinary doctrine of the Fourth Amendment and Article 1, Section 11 of the Indiana Constitution. We affirm the conviction.

1

**Facts and Procedural History**

Garcia-Torres's first victim was M.S., a twenty-one year old undergraduate attending Valparaiso University.  On July 18, 2004, Garcia-Torres frantically rang the doorbell of M.S.'s apartment.  When M.S. cracked the door to look outside, Garcia-Torres forced his way in.  A violent struggle ensued, and M.S. sustained numerous injuries (including a bruised spleen) as well as damage to her apartment.  After struggling for about two hours, M.S. was exhausted and no longer possessed the strength to keep Garcia-Torres at bay.  Garcia-Torres forced a sock into her mouth to silence her and then had vaginal intercourse with her, taking her virginity.  When Garcia-Torres had finished he covered M.S. with a blanket, told her "it's going to be okay," and departed the scene.  (Trial Tr. at 51.)

M.S. immediately called 911.  M.S. was taken to Porter Memorial Hospital where genital swabs were taken.  Valparaiso Police Detective Thomas Horn began investigating the rape.  The investigation remained open, but without a suspect until Garcia-Torres struck again.

Garcia-Torres's second victim was S.P., a graduate student at Valparaiso University.  S.P.'s apartment was roughly half a mile from M.S.'s apartment.  On June 11, 2005, S.P. awoke to the sound of her dog growling; she also heard a tapping at her window.  She began to get up when Garcia-Torres leapt through the window and landed on her bed.  S.P. began screaming for help and struggling with her attacker.  A neighbor heard the screaming and called the police.

Garcia-Torres had just started to remove S.P.'s shorts when Valparaiso Police Officer Brian McDonald knocked forcefully on her door.  When the officer announced himself, Garcia-Torres released S.P.  S.P. opened the door for McDonald who ran into her bedroom just in time to see Garcia-Torres jump out a window.  Garcia-Torres was not wearing pants, socks, or shoes.  Two other Valparaiso Police officers waiting outside saw this leap out the window and chased after Garcia-Torres, but he eluded them.

After the attack, S.P. returned to the apartment with Detective John Ross.  S.P. found a shoe in her bedroom that she had never seen before.  A search of the area where officers had

2

chased Garcia-Torres produced a cell phone that was registered to Ray Garcia, Garcia-Torres's roommate. Ray Garcia told officers that he had sold the phone to Garcia-Torres. Ray Garcia and another roommate were able to identify the shoe found in S.P.'s apartment as being similar to shoes owned by Garcia-Torres. Garcia-Torres matched the description of the attacker given by S.P. These revelations made Garcia-Torres the prime suspect, and the police picked him up and took him to the police station.

Garcia-Torres was placed in an interview room where Officer Baldazo of the Lake Station Police Department, who was used as an interpreter, attempted to read the <u>Miranda</u> warnings in Spanish. Detective Ross interviewed Garcia-Torres. He confessed to attempting to rape S.P. (Mot. to Suppress Hr'g Tr. at 62, May 1, 2006; Mot. to Suppress Hr'g State's Ex. 1, May 1, 2006.) Garcia-Torres then directed officers to S.P.'s apartment and other locations as they drove around Valparaiso. After being interviewed by Detective Ross, Garcia-Torres was informed that he was being detained.

After the interview with Detective Ross, Detective Horn swabbed the inside of Garcia-Torres's cheek for DNA. Officer Baldazo described the procedure to Garcia-Torres and asked him "Is it okay?" (Mot. to Suppress Hr'g Tr. at 54, Apr. 5, 2007.) Garcia-Torres consented and opened his mouth. Garcia-Torres's DNA matched both the DNA taken from M.S.'s rape kit and some DNA found on the shoe left in S.P.'s apartment.

Detective Horn then interviewed Garcia-Torres. Garcia-Torres agreed to show the officers where the rape occurred. Garcia-Torres again got in a car with officers and directed them to M.S.'s apartment. He then confessed to raping M.S. (Mot. to Suppress Hr'g State's Ex. 4, May 1, 2006.) The trial court subsequently suppressed all of Garcia-Torres's incriminating statements because the <u>Miranda</u> warnings had not been accurately translated into Spanish.[1] On the other hand, the trial court denied Garcia-Torres's motion to suppress the DNA evidence.

---

[1] The State has not challenged the suppression of the confessions.

Garcia-Torres was convicted of one count of rape,[2] one count of attempted rape,[3] and two counts of burglary.[4]  The court sentenced Garcia-Torres to thirty-six years in prison.  The Court of Appeals affirmed.  Garcia-Torres v. State, 914 N.E.2d 268 (Ind. Ct. App. 2009).  We granted transfer and now affirm.[5]

## Standard of Review

We review de novo a trial court's ruling on the constitutionality of a search.  Campos v. State, 885 N.E.2d 590, 596 (Ind. 2008).

## I.   Is a Cheek Swab a Search?

The obvious threshold question is whether a cheek swab taken from a person under arrest is a search requiring its own separate warrant or other justification.  A cheek swab can be analogized to two lines of cases, those governing intrusions into the body, which suggest that a cheek swab is a search, and those governing fingerprinting and other physical identifiers, which suggest that a cheek swab is not a search.  Most courts that have addressed the constitutionality of cheek swabs have concluded that a cheek swab is a "search" for the purpose of the Fourth Amendment, and have reached this conclusion with relatively little discussion.  See, e.g., United States v. Pool, 621 F.3d 1213 (9th Cir. 2010); Louisiana v. Lee, 976 So.2d.109, 124 (La. 2008).

### Biological Intrusions

In Schmerber v. California, the United States Supreme Court held that a blood test to check blood alcohol level was a search.  384 U.S. 757 (1966).  Law enforcement officer arrested Schmerber for driving under the influence of alcohol and took him to a hospital, where a police

---

[2] Ind. Code § 35-42-4-1 (2008).
[3] Ind. Code § 35-42-5-1 (2008).
[4] Ind. Code § 35-43-2-1 (2008).
[5] Aside from the DNA swab, Garcia-Torres argued that he was entitled to have charges related to M.S. severed from charges related to S.P.  We summarily affirm the Court of Appeals on this issue under Indiana Appellate Rule 58 (A)(2).

officer directed a doctor to draw Schmerber's blood despite the arrestee's objection. Analysis of the sample revealed a high blood alcohol content. The Court held that the search was reasonable, in part, because blood tests are commonplace and "involve[] virtually no risk, trauma, or pain." Id. at 771. It stated that "the Constitution does not forbid the States minor intrusions into an individual's body" although it stressed the narrowness of its holding. Id. at 772.

In the years after Schmerber, the Court examined several more bodily intrusion cases. In Cupp v. Murphy, the police took fingernail scrapings without a warrant from a suspect who was being interviewed, but was not yet under arrest. 412 U.S. 291, 292 (1973). The Court declared that this was a reasonable search, despite the suspect's objection to the procedure. Id. at 296. In Bell v. Wolfish, the Court held that visual body-cavity inspections of pretrial detainees were searches, but found the searches reasonable. 441 U.S. 520, 558–59 (1979). In Winston v. Lee, prosecutors wanted a court to order the defendant to undergo surgery requiring general anesthetic so that a bullet lodged in his chest could be used as evidence. 470 U.S. 753, 755 (1985). The Court held that such an intrusion would be a search and an unreasonable one. Id. at 766.

These bodily intrusion cases culminated in Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602 (1989). At issue in that case were federal regulations that required railroads to take blood and urine samples from employees after railroad accidents and permitted the railroads to require their employees to submit to breath and urine tests under certain circumstances. Id. at 609–11. The regulations required the railroads to turn the samples over to federal authorities.

The Court held that all three types of tests were searches. It noted that the blood tests required "penetration beneath the skin," an aspect of the procedure in Schmerber which had led to the finding of search. Id. at 616. In holding that breathalyzer are tests searches, the Court reasoned that breathalyzer tests "generally require[] the production of alveolar or 'deep lung' breath for chemical analysis implicat[ing] similar concerns about bodily integrity." Id. at 616–17 (citations omitted). Although taking a urine sample does not involve an intrusion into the body, the Court held taking such a sample was a search because it intruded on what is normally a private act and because it could reveal private medical facts. Id. at 617.

5

This Court has also addressed whether biological testing is a search. In McClain v. State, the defendant raped a child and infected her with gonorrhea. 274 Ind. 250, 410 N.E.2d 1297 (1980). Police obtained a warrant to swab the defendant's penis. We concluded after a thorough discussion that this swab was a search. Although the swab did not involve a probing beneath the skin, it did involve more of an intrusion than fingerprinting because of the potential for humiliation and anxiety involved. Id. at 254–55, 410 N.E.2d at 1300–01. Thus we held that the swab was a search for the purposes of the Fourth Amendment.

### Non-Search Examples

Another analytical field involving information taken from a suspect or arrestee involves cases where various techniques are declared not to be searches requiring a separate finding of probable cause.

Fingerprinting a person lawfully arrested, for example, is not a search implicating the Fourth Amendment. Palmer v. State, 679 N.E.2d 887, 892 (Ind. 1997). Courts have long recognized that law enforcement can take biological measurements and photographs of arrestees to aid in identification. State ex rel. Bruns v. Clausmeier, 154 Ind. 599, 601–02, 57 N.E. 541, 542 (1900). The "taking of fingerprints under ordinary circumstances is not an indignity," wrote Justice Richman for a unanimous bench. State ex rel. Mavity v. Tyndall, 224 Ind. 364, 377, 66 N.E.2d 755, 760 (1946). The procedure is so commonplace, that even in the 1940's it was a regular procedure in maternity wards. The Court noted that the practice is not intrusive, and that it is required for numerous normal activities from joining the military, to obtaining a passport, to gaining various public licenses. See id. at 378, 66 N.E.2d at 760.

The U.S. Supreme Court has never expressly ruled that fingerprinting is not a search, but what it has said about fingerprinting and other physical identifiers is instructive. The Court held in United States v. Dionisio, for example, that requiring a suspect to provide a voice exemplar was not a search. 410 U.S. 1, 14 (1972). What Justice Stewart called the Fourth Amendment's "interests in human dignity" were held immeasurably further removed from the intrusion in Schmerber, much more similar to fingerprinting. Id. at 14–15 (quoting Schmerber v. California,

6

384 U.S. 757, 769–70 (1965)).  The same day that <u>Dionisio</u> was decided, the Court also held that requiring a person to submit a handwriting exemplar was not a search.  <u>United States v. Mara</u>, 410 U.S. 19, 22 (1972).

In <u>Davis v. Mississippi</u>, the Court did require suppression of fingerprints taken from the defendant because the police used a dragnet to detain and fingerprint a number of individuals even though there was no individualized suspicion linking them to the crime.  394 U.S. 721 (1969).  The Court focused on the seizure of the defendant's person rather than on the taking of the fingerprints.  About such seizures (in circumstances other than the defendant's) the Court said:

> Detentions for the sole purpose of obtaining fingerprints are no less subject to the constraints of the Fourth Amendment.  It is arguable, however, that, because of the unique nature of the fingerprinting process, such detentions might, under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional sense.  Detention for fingerprinting may constitute a much less serious intrusion upon personal security than other types of police searches and detentions.  Fingerprinting involves none of the probing into an individual's private life and thoughts <u>that marks an interrogation or search</u>.  Nor can fingerprint detention be employed repeatedly to harass any individual, since the police need only one set of each person's prints.  Furthermore, fingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions and is not subject to such abuses as the improper line-up and the "third degree." Finally, because there is no danger of destruction of fingerprints, the limited detention need not come unexpectedly or at an inconvenient time.

<u>Id.</u> at 727 (emphasis added).

The Court later emphasized in <u>Dunaway v. New York</u> that the problem in <u>Davis</u> was not with the fingerprinting itself, but rather that the fingerprints had to be suppressed because the initial seizure of Davis and the accompanying interrogation were done without probable cause. 442 U.S. 200, 215 (1978).  After <u>Dunaway</u> and <u>Davis</u>, the question of whether a "'narrowly circumscribed procedure for obtaining' the fingerprints of suspects without probable cause" is constitutional remained open.  <u>Id.</u> (quoting <u>Davis</u>, 394 U.S. at 728).

The Court next addressed fingerprinting in <u>Hayes v. Florida</u>, 470 U.S. 811 (1984). Police suspected the defendant committed a rape but had no probable cause to believe that he had done so. They took him from his home to the police station without his consent and fingerprinted him. <u>Id.</u> at 812–13. The Court suppressed the fingerprints, relying as in <u>Dunaway</u> on the manner of the seizure rather than the taking of the fingerprints. The Court was quick to add that nothing in its decision

> implies that a brief detention in the field for the purpose of fingerprinting, where there is only reasonable suspicion not amounting to probable cause, is necessarily impermissible under the Fourth Amendment. . . . There is support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch.

<u>Id.</u> at 816–17. As recently as 2003, the Court has reiterated that the possibility remains open for seizures to secure fingerprints based on less than probable cause. <u>Kaupp v. Texas</u>, 538 U.S. 626, 630 n.2 (2003).

Thus, the thread running through the Court's decisions on fingerprinting has been a focus on the seizure of the person preceding the fingerprinting. It has never hinted that fingerprinting itself is a search subject to the Fourth Amendment and indeed it has expressly held that other physical exemplars used to identify suspects are not searches. <u>Dionisio</u>, 410 U.S. 1 (voice exemplars); <u>Mara</u>, 410 U.S. 19 (handwriting exemplars). These cases are in accord with our holding in <u>Palmer v. State</u> that fingerprinting someone properly arrested is not a search.

This dividing line has been the central point in the federal decisions on statutes that require DNA samples be taken from persons for whom there is probable cause to arrest or otherwise search. <u>See</u> <u>United States v. Pool</u>, 621 F.3d 1213, 1219 (9th Cir. 2010) (Callahan, J.) (noting that "there must be some legitimate reason for the individual having less than the full rights of a citizen" before the totality-of-the-circumstances test could be applied to a warrantless DNA test).

Cheek swabs are not the same as fingerprints, but they are a long way from the bodily intrusions condemned in Schmerber and its progeny. A cheek swab does involve an intrusion into the body, but the intrusion is not as severe as the piercing of the skin as in Schmerber, but is probably at least as intrusive as the breathalyzer tests that were searches in Skinner. The method of swabbing also bears striking similarity to the manner of search in McClain. But that is the end of the similarity to those cases.

The cheek swab for DNA also resembles fingerprints, and some of the similarities to fingerprinting carry cheek swabs away from the analogy of the Schmerber line of cases. For example, cheek swabs are not particularly intrusive. The swab in this case took only about twelve seconds and caused Garcia-Torres no apparent discomfort. This is certainly less time than it would take to fingerprint Garcia-Torres. Although the level of discomfort for both procedures is certainly trivial, it seems that swabbing causes less discomfort than fingerprinting, which requires manipulating the fingers in a manner that is often uncomfortable. Cheek swabs are also easily distinguishable from the penile swab in McClain. For much the same reason that the urine samples were declared searches in Skinner despite the absence of bodily intrusion, the sexual and excretory nature of penile swab is a far greater intrusion on a person's privacy than a cheek swab.

Where the DNA swab tracks closest to fingerprinting and furthest from Schmerber is in its purpose. Although both DNA and fingerprints can be used to link suspects to crime scenes, their main purpose is identification. Fingerprinting is a routine booking procedure, and the fingerprints taken are not always used at trial. The evidence gathered in the Schmerber line of cases could be used only as substantive evidence of guilt in the particular case for which it was gathered. In Schmerber, the central object of the blood draw was to prove the defendant was intoxicated. Similarly, the fingernail scrapings in Cupp showed that the defendant strangled his wife. Recovering the bullet in Winston would have shown that he was involved in a particular armed robbery. In the words of Justice Stewart, "fingerprints are not 'evidence' in the conventional sense." Davis, 394 U.S. at 730 (Stewart, J., dissenting). DNA seems to have more in common with fingerprint evidence than with blood alcohol level.

9

Garcia-Torres argues that a DNA extraction is a great intrusion because DNA can reveal genetic information beyond identity such as paternity or maternity[6] and information concerning "genetically influenced diseases, conditions, and behaviors." (Pet. to Transfer at 4–5.) This aspect of DNA information is oft repeated by commentators.[7] In this case, two witnesses testified at length about how the samples taken from Garcia-Torres were used. (Trial Tr. at 330–50, 354–69.) There is no evidence in the record that the DNA from Garcia-Torres's swab was or will be used for any purpose other than comparing it to the samples in the rape kit and from the shoe.[8] Use for other purposes would necessitate further analysis.

Taken as a whole, the cases above appear to reflect a range of analytical treatment that varies with degree of intrusion and the purpose for using the thing demanded. This range begins with searches requiring individualized showings of probable cause and approval from a magistrate – to extractions still called searches but declared generally reasonable under most circumstances not requiring judicial approval in advance – to demands for information or material declared not to be searches at all and not requiring a separate determination of anything greater than reasonable suspicion.

---

[6] This concern seems minimal. Paternity is of course a matter of legitimate state concern. Ind. Code § 31-14-1-1 (2008). Our law already provides for compulsory genetic testing in paternity actions, including those brought by the State. Ind. Code §§ 31-14-4-1 & -6-1 (2008).

[7] A similar criticism could be leveled at fingerprinting. The technological breakthrough making fingerprinting useful came from attempts to use fingerprints to further the eugenics movement. Simon A. Cole, Fingerprint Identification and the Criminal Justice System: Historical Lessons for the DNA Debate, in DNA and the Criminal Justice System: The Technology of Justice 63, 66 (David Lazer, ed. 2004). Scientists were attempting to link fingerprint patterns to criminality, disease, and race. Id. at 66–67. It appears that science has been able to link fingerprint patterns to race and ethnicity, and attempts to link fingerprint patterns to behavioral traits are not entirely a thing of the past. Id. at 76–77. One commentator argues

> [h]ad even a fraction of the scientific resources devoted to researching links between genes and disease, race, and behavior been devoted to researching links between fingerprint patterns and disease, race, and behavior, the latter might seem as significant to us as the former. The conception of fingerprints as useful only for identification is not a natural fact, but a historical achievement.

Id. at 77 (emphasis in original).

[8] It appears the DNA used for testing is typically what is called "junk DNA," i.e., DNA that is unique to individuals, but does not contain coding for any genetic traits. United States v. Kincade, 379 F.3d 813, 818 (9th Cir. 2004). There remains the possibility that junk DNA might eventually be linked to genetic traits. See id. at 818 n.6. This possibility is speculative at best. See United States v Pool, 621 F.3d 1213, 1221 (9th Cir. 2010). There is no evidence in the record stating whether the DNA taken from Garcia-Torres was junk DNA or some other DNA.

10

Fourth Amendment principles seem to suggest that DNA has more in common with fingerprints then it does with blood alcohol content, but like many courts, the parties to this appeal have taken for granted that the swab was a search requiring its own separate probable cause proceedings, even for a suspect in lawful custody for rape. We thus proceed to the State's leading defense of admitting the DNA evidence – that Garcia-Torres consented to the cheek swab.

## II.     The Cheek Swab was Taken under a Valid Consent

The Fourth Amendment protects people from unreasonable searches and seizures. Normally, the Fourth Amendment is satisfied when police obtain a warrant. A warrant is not required, however, when there is consent to search. Consent to search is valid when it is given voluntarily, voluntariness is a question of fact determined from the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1972). Voluntariness is not vitiated merely because the defendant is in custody. United States v. Watson, 423 U.S. 411, 424 (1976).

Garcia-Torres voluntarily consented to the cheek swab. Officer Baldazo described the procedure and asked Garcia-Torres in Spanish "[i]s it okay?" (Mot. to Suppress Hr'g Tr. at 54, Apr. 5, 2007.) Garcia-Torres responded in the affirmative, speaking Spanish. (Mot. to Suppress Hr'g State's Ex. 1, May 1, 2006.) Officer Baldazo translated Garcia-Torres's affirmative statement as "no problem." (Mot. to Suppress Hr'g State's Ex. 1, May 1, 2006.) When Detective Horn entered the interview room with the swab, Garcia-Torres opened his mouth. (Mot. to Suppress Hr'g State's Ex. 1, May 1, 2006.) He cooperated and was helpful through the entire procedure and was grinning broadly after the swab was complete. (Mot. to Suppress Hr'g State's Ex. 1, May 1, 2006.) Shortly before the swab was taken, Garcia-Torres told officers "it was his fault" and that he "just wants to tell the truth." (Mot. to Suppress Hr'g State's Ex. 1, May 1, 2006.) After the swab, he told officers "I feel sorry for what I did," and that he signed the Miranda waiver because he "wanted to do what's right." (Mot. to Suppress Hr'g State's Ex. 1, May 1, 2006.) He also said that he felt an attorney was not necessary because "he knew what

he did was wrong and if he goes to jail or gets deported to Mexico or anything like that, he accepts it." (Mot. to Suppress Hr'g State's Ex. 4, May 1, 2006.)

Nothing in this series of events suggests that Garcia-Torres's consent was given involuntarily. His statements and actions indicate that he wanted to cooperate with the police because he felt remorseful and was willing to accept responsibility for his actions.

Garcia-Torres argues that the confession was not voluntary because the Miranda warnings were not sufficient.[9] (Br. of Appellant at 8.) Miranda warnings are designed to protect a suspect's Fifth Amendment right not to incriminate himself rather than a suspect's Fourth Amendment right to be free from unreasonable searches and seizures. Although a failure of Miranda warnings is a factor to be considered in the totality of the circumstances analysis, it is not dispositive. The Fourth Amendment does not require Miranda warning before officers ask for consent to search.

Garcia-Torres also argues that the consent was not voluntary because he was only eighteen years old, an immigrant, and had only six years of education in Mexico. (Br. of Appellant at 8.) In Colorado v. Connelly, the Supreme Court held that a defendant's mental state or condition (other than a mental state caused by police coercion) is not a factor in determining voluntariness. 479 U.S. 157 (1986). The factors raised by Garica-Torres do not establish any "coercive police activity," which the Court has said is "a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Id. at 167.

Looking at the totality of the circumstances, we hold that Garcia-Torres's consent was voluntary. As such, the swab was not a violation of the Fourth Amendment.

---

[9] Garcia-Torres also argues that the DNA evidence should have been suppressed because it was inextricably bound to the suppressed confession. We summarily affirm the Court of Appeals on this point. Ind. App. R. 58(a)(2).

### III.    A <u>Pirtle</u> Warning Was Not Required

Garcia-Torres argues that he was entitled to a <u>Pirtle</u> advisement before the swab was taken.  In <u>Pirtle v. State</u>, we held that a person held in police custody is entitled to the presence and advice of counsel prior to consenting to a search and that the right, if waived, must be explicitly waived.  263 Ind. 16, 29, 323 N.E.2d 634, 640 (1975).

As a threshold matter we must determine whether Garcia-Torres was in custody when he was asked to consent.  Although there is some uncertainty whether Garcia-Torres was in custody when initially brought to the police station, he was clearly in custody when the swab was taken.  After confessing to breaking into S.P.'s apartment and attempting to rape her, Garcia-Torres asked whether he would be detained.  The officers told him that they would indeed be detaining him.  The swab was taken after this exchange.

Our constitutional protections are intended to protect people from the most serious intrusions into privacy.  <u>Pirtle</u> itself involved one of the weightiest of these interests--the search of a home.  Officers arrested Pirtle for possessing a stolen car and gave him his <u>Miranda</u> rights.  At the police station Pirtle asked for an attorney.  Later, another officer who was unaware that Pirtle had asked for an attorney began to question Pirtle about an unrelated murder.  The officer asked for consent to search Pirtle's home, and he gave it and signed a search waiver.  Police found evidence implicating him in the murder.  <u>Pirtle</u>, 263 Ind. at 22–23, 323 N.E.2d at 637.  We suppressed the evidence on grounds that Pirtle was not advised that he had the right to consult an attorney about giving consent to search.

<u>Pirtle</u> and the ensuing cases have applied this rule only to the weightiest intrusions.  This Court has suppressed evidence based on <u>Pirtle</u> when the police searched either a home or a vehicle.  <u>E.g.</u>, <u>Pirtle</u>, 263 Ind.16, 323 N.E.2d 634 (home search); <u>Sellmer v. State</u>, 842 N.E.2d 358 (Ind. 2006) (vehicle search).  The Indiana Court of Appeals has held that <u>Pirtle</u> does not apply to certain minimally intrusive searches.  <u>Wilkerson v. State</u>, 933 N.E.2d 891 (Ind. Ct. App. 2010) (<u>Pirtle</u> not applicable to pat down for weapons permissible under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968)); <u>Datzek v. State</u>, 838 N.E.2d 1149, 1158–60 (Ind. Ct. App. 2006) (<u>Pirtle</u> does not apply

to chemical blood testing for blood alcohol content); <u>Schmidt v. State</u>, 816 N.E.2d 925, 942–44 (Ind. Ct. App. 2005) (<u>Pirtle</u> does not apply to chemical breath tests); <u>Ackerman v. State</u>, 774 N.E.2d 970, 979–82 (Ind. Ct. App. 2002) (<u>Pirtle</u> does not apply to field sobriety tests).

As in those cases, the intrusion here is slight. The swabbing caused no discomfort, and Garcia-Torres has virtually no legitimate interest in concealing his identity following his lawful arrest. This Court has long held that the police are allowed to take fingerprints and other identifying physical information from those lawfully arrested. <u>Palmer v. State</u>, 679 N.E.2d 887, 892 (Ind. 1997) (fingerprinting); <u>State ex rel. Bruns v. Clausmeier</u>, 154 Ind. 599, 601–02, 57 N.E. 541 (1900) (other physical identifying information). "[W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it." <u>Jones v. Murray</u>, 962 F.2d 302, 306 (4th Cir. 1992).

The various interests at stake on occasions when we have required a <u>Pirtle</u> advisement are not present here, so we do not extend that rule to these circumstances.

## Conclusion

Therefore we affirm the judgment of the trial court.

Dickson, Sullivan, and David, JJ., concur.
Rucker, J., dissents with separate opinion.

**Rucker, J., dissenting.**

At stake in this case is whether a person in police custody is entitled to be advised of his right to the assistance of counsel before consenting to a buccal swab for DNA. The majority says no. I respectfully disagree.

The majority acknowledges that "Most courts that have addressed the constitutionality of cheek swabs have concluded that a cheek swab is a "search" for the purpose of the Fourth Amendment." Slip op. at 5. But the majority seems to take issue with "most courts" by declaring "Fourth Amendment principles seem to suggest that DNA has more in common with fingerprints than it does with blood alcohol . . . . " Slip op. at 12. Although the majority's discussion concerning fingerprints is interesting and informative, it seems to me to have little bearing on the question of whether for purposes of the Fourth Amendment a DNA swab is a search.

Even though holding that invasions of the body are searches, and thus are entitled to the protections of the Fourth Amendment, see Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616-17 (1989) (blood, breath, and urine samples), the United States Supreme Court has not spoken on the question of whether a DNA swab is a search. However, every Federal Circuit Court addressing this issue has expressly concluded that the gathering and testing of DNA samples, by either a blood sample or a cheek swab, are searches subject to the Fourth Amendment.[1] Other Federal Circuit Courts, while not expressly so pronouncing, have treated

---

[1] See, e.g., Friedman v. Boucher, 580 F.3d 847, 852 (9th Cir. 2009) (declaring "[t]here is no question that [a pre-trial detainee's cheek] swab constituted a search under the Fourth Amendment" and concluding the swab was an unreasonable search violating the Fourth Amendment); United States v. Weikert, 504 F.3d 1, 6 (1st Cir. 2007) ("Unquestionably, the extraction of blood for DNA profiling constitutes a search within the meaning of the Fourth Amendment."); United States v. Amerson, 483 F.3d 73, 77 (2d Cir. 2007) (finding in reference to statutes mandating prisoner DNA sampling, "[i]t is settled law that . . . a physical intrusion to obtain a tissue sample and a chemical analysis to obtain private physiological information about a person[ ] are subject to the strictures of the Fourth Amendment"); United States v. Sczubelek, 402 F.3d 175, (3d Cir. 2005) ("Requiring [a probationer] to give a blood sample constitutes a Fourth Amendment search. The ensuing chemical analysis of the sample to obtain physiological data is also a search covered by the Fourth Amendment." (internal quotation marks and citation omitted)); Jones v. Murray, 962 F.2d 302, 306 (4th Cir. 1992) (in a case of prisoner DNA sampling, recognizing as "established . . . that the bodily intrusion resulting from taking a blood sample constitutes a search within the scope of the Fourth Amendment"); Kohler v. Englade, 470 F.3d 1104, 1109 (5th Cir. 2006) ("It is

1

DNA sampling as though it were a search under the Fourth Amendment.[2]  Until today this jurisdiction's case authority has also unambiguously adhered to the view that the taking of a DNA sample from a person's body constitutes a search.  See, e.g., Balding v. State, 812 N.E.2d 169, 172 (Ind. Ct. App. 2004) ("[t]he taking of a biological sample, such as a DNA sample, constitutes a 'search' for purposes of the Fourth Amendment."); Patterson v. State, 742 N.E.2d 4, 9 (Ind. Ct. App. 2000) (same).

Based on the foregoing authority it is clear to me that a cheek swab is a search within the meaning of the Federal Constitution.  And this can be no less true under the Indiana Constitution.  The United States Constitution establishes a minimum level of protection to citizens of all states.  See Oregon v. Hass, 420 U.S. 714, 719 (1975).  But a state is free as a matter of its own constitutional law to confer rights above the floor of constitutional safeguards found in the United States Constitution.  See, e.g., Pruneyard Shopping Ctr. v. Robin, 447 U.S. 74, 81 (1980); Cooper v. California, 386 U.S. 58, 62 (1967).  In fact on the question of search and seizure the Indiana Constitution does provide greater protection than the Federal Constitution.  This brings me to my next point.

The heart of this case concerns the validity of the defendant's consent to search given while the defendant was in police custody.  Article 1, Section 11 of the Indiana Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects,

---

undisputed that the collection of a saliva sample for DNA analysis is a search implicating the Fourth Amendment" and recognizing a Fourth Amendment violation where a DNA swab of a suspected serial killer was obtained pursuant to a defective warrant); United States v. Hook, 471 F.3d 766, 772 (7th Cir. 2006) (observing that "taking a DNA sample is a Fourth Amendment search); Banks v. United States, 490 F.3d 1178, 1183 (10th Cir. 2007) ("[A]nalyzing the DNA contained within [a] blood sample, or even from a cheek swab, must pass Fourth Amendment scrutiny."); Johnson v. Quander, 440 F.3d 489, 493 (D.C. Cir. 2006) ("There is no question that the compulsory extraction of blood for DNA profiling constitutes a 'search' within the meaning of the Fourth Amendment.").

[2] See, e.g., United States v. Gross, No. 08-4051, 2010 WL 4069146, at *6 (6th Cir. Oct. 19, 2010) (noting in response to defendant's contention that his DNA swab was unconstitutional, "[t]he DNA swab was only taken after a valid search warrant was taken in order to swab [defendant]"); United States v. Kraklio, 451 F.3d 922, 923 (8th Cir. 2006) ("The government does not dispute the drawing of blood for purposes of DNA collection is a search subject to Fourth Amendment scrutiny."); Padgett v. Donald, 401 F.3d 1273, 1277 (11th Cir. 2005) (assessing a DNA swab for Fourth Amendment reasonableness because "[t]he [defendant] does not dispute that the statutorily required extraction of saliva for DNA profiling constitutes a 'search' within the meaning of the Amendment").

against unreasonable search or seizure, shall not be violated . . . ." "While almost identical in wording to the federal Fourth Amendment, the Indiana Constitution's Search and Seizure clause is given an independent interpretation and application." Myers v. State, 839 N.E.2d 1146, 1153 (Ind. 2005).

Indiana law on consent to a search given while in custody derives from Pirtle v. State, 323 N.E.2d 634 (Ind. 1975). In that case Pirtle was in police custody due to an arrest for possession of a stolen automobile. Id. at 636. The police read Miranda rights to him in the squad car and again at the police station. Id. at 637. Pirtle did not waive his rights either time and requested to speak to an attorney when questioned at the station. Though counsel was not provided, approximately twelve hours later two other officers questioned Pirtle again. One asked for permission to search his apartment, which Pirtle authorized. The police searched the apartment and discovered witnesses and direct evidence linking Pirtle to a homicide. Id. Pirtle challenged the admission of that evidence, and this Court said:

> When a defendant is in custody at the police station there is no 'practical' reason for depriving him of the assistance of counsel in making the decision whether to consent to a search. . . . We hold that a person who is asked to give consent to search while in police custody is entitled to the presence and advice of counsel prior to making the decision whether to give such consent. This right, of course, may be waived, but the burden will be upon the State to show that such waiver was explicit, and, as in Miranda, the State will be required to show that the waiver was not occasioned by the defendant's lack of funds.

Id. at 640. Five years later the Court declared "There is no ambiguity in the Pirtle opinion. . . . [W]e recognized the right of those in custody to have the advice of counsel at the point where a consent to search is requested, and expressly and clearly imposed upon the State the burden in court of demonstrating an explicit waiver of such right as a condition to introducing the fruits of such searches." Sims v. State, 413 N.E.2d 556, 559 (Ind. 1980), overruled on other grounds by Wright v. State, 658 N.E.2d 563 (Ind. 1995).

Pirtle and Sims have long been understood to "stand for the proposition that, *under the Indiana Constitution*, a person in custody must be informed of the right to consult with counsel

about the possibility of consenting to a search before a valid consent can be given. Merely giving an arrestee the Miranda advisement before interrogation is insufficient to inform him of his right to consult with counsel before consenting to a search." Torres v. State, 673 N.E.2d 472, 474 (Ind. 1996) (emphasis added) (internal citations and quotations omitted); see also Campos v. State, 885 N.E.2d 590, 601 (Ind. 2008) ("Article [1], section 11 of the Indiana Constitution requires that a person in custody explicitly waive the right to counsel before giving a valid consent to a search.") (internal citations and quotations omitted). This right is unique to Indiana and has no parallel under the Federal Constitution. See United States v. LaGrone, 43 F.3d 332, 337 (7th Cir. 1994) ("A person in custody has no federal constitutional right to consult with an attorney before consenting to a search of his property. However, the Indiana [C]onstitution does afford such a right."). And, where a defendant's rights under Pirtle have been violated, the fruits of the search are not admissible in court. See Brown v. State, 653 N.E.2d 77, 80 (Ind. 1995) (referring to Article 1, Section 11, and declaring, "our state constitution mandates that the evidence found as a result of [an illegal] search be suppressed. Only by such suppression can the privacy of all Hoosiers be adequately protected.") (internal citation omitted).

Although hedging on whether it believes a cheek swab for DNA is a search – a matter that is settled in my view – the majority nonetheless proceeds to address the implications of Pirtle and declines to enforce its constitutional protection on grounds that the intrusion here was "slight" and not very "serious." Slip op. at 14, 15. And it implies that Pirtle is applicable only for searches of homes and automobiles. Id. at 14. As to this latter point, the Indiana Constitution makes no such distinction. Instead, the constitution protects Hoosiers against "unreasonable searches" of "their persons" as well as their "houses, papers, and effects."[3] Importantly, as this Court has declared, "Searches performed by government officials without warrants are *per se unreasonable* under the Fourth Amendment, subject to a few specifically established and well-delineated exceptions." Holder v. State, 847 N.E.2d 930, 940 (Ind. 2006) (emphasis added) (internal quotations omitted). Certainly, Hoosiers are entitled to no less protection under Article 1, Section 11 of the Indiana Constitution. And precisely because the police did not obtain a

---

[3] The same is true under the Federal Constitution. As Justice Brennan expressed in writing for the majority in Schmerber v. California, "Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned." 384 U.S. 757, 770 (1966).

warrant before conducting the search, it was "per se unreasonable." That is, the search was unreasonable as a matter of law. And although there are a number of "specifically established and well-delineated exceptions" there is no DNA exception to the warrant requirement.

Concerning the notion that the body invasion here is "slight" and not very "serious" or in essence "minimally intrusive," certainly this cannot mean that one's body cavity and the DNA it yields are areas in which a person does not maintain a reasonable expectation of privacy. See Smith v. State, 744 N.E.2d 437, 439 (Ind. 2001) (acknowledging a legitimate expectation of privacy in body and blood samples, and in the DNA they contain). The constitutional standard for searches is reasonableness, not intrusiveness, seriousness, or weight.

Where courts have permitted DNA searches or other bodily intrusions, they have done so not merely on the basis that the search is "minimally intrusive," but rather because either a warrant or an exception to the warrant requirement was present. The bodily intrusions cases cited by the majority bear this out. In Schmerber v. California, the Supreme Court first concluded that the search was permissible under the "search incident to lawful arrest" exception to the warrant requirement and further "the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence" because "the percentage of alcohol in the blood begins to diminish shortly after drinking stops . . . . [and] there was no time to seek out a magistrate and secure a warrant." 384 U.S. 757, 770-71 (1966) (internal citations and quotations omitted). In similar fashion the taking of fingernail scrapings in Cupp v. Murphy was justified on the potential for destruction of evidence basis enunciated in the "search incident to lawful arrest" warrant exception. 412 U.S. 291, 296 (1973) (citing Chimel v. California, 395 U.S. 752 (1969), narrowed in part on other grounds by Arizona v. Gant, 129 S. Ct. 1710, 1719 (2009)). The blood, breath, and urine tests in Skinner were permissible under the "special needs" exception to the warrant requirement. 489 U.S. at 619-20, 633.

In addition, most courts analyzing the constitutionality of statutes requiring DNA sampling of inmates, probationers, and parolees note that such searches are excepted from the warrant requirement due to the petitioner's status as a person subject to state pretrial or correctional supervision and because statutory limits circumscribe the scope of the search. See,

e.g., United States v. Pool, 621 F.3d 1213, 1219 (9th Cir. 2010), reh'g en banc granted (finding that the deprivation of the defendant's liberty as a result of a judicial probable cause finding for federal felony charges was critical in allowing the conclusion that the DNA sample did not violate Fourth Amendment); United States v. Sczubelek, 402 F.3d 175, 187 (3d Cir. 2005) (concluding that DNA sampling of a probationer pursuant to federal statute did not run afoul of the Fourth Amendment in  part because the statute 1) limited the discretion of probation officers in taking the samples, 2) limited the purposes for which the samples could be used, 3) provided punishments for unauthorized disbursement or obtaining of DNA samples, and 4) provided for expungement of the DNA information from the database upon reversal or dismissal of a conviction); Green v. Berge, 354 F.3d 675, 679-81 (7th Cir. 2004) (Easterbrook, J., concurring) (holding that DNA searches of Wisconsin penitentiary inmates were permitted under the "special needs" exception and recognizing that persons subject to state supervision have reduced privacy interests concomitant with the degree of restriction on their liberty).   Cf. Bell v. Wolfish, 441 U.S. 520, 559 (1979) (finding body cavity searches of inmates conducted pursuant to prison rules "reasonable" considering the "serious security dangers" in a detention facility).

In sum, it is clear to me that a buccal swab for DNA is a search within the meaning of the Fourth Amendment to the United States Constitution as well as Article 1 Section 11 of the Indiana Constitution. Because the search in this case was conducted without a warrant it was illegal and therefore unreasonable as a matter of law unless an exception applied.  The only applicable exception in this case was consent to search, which the defendant gave.  Thus there was no federal constitutional violation.  But, the Indiana Constitution provides greater protection than the Federal Constitution.  And under our state constitution the investigating officer was required to advise Garcia-Torres that he had a right to consult with his lawyer before consenting to the search.  Because no such advisement was given, the consent was invalid as a matter of Indiana law.  The evidence obtained thereby was thus inadmissible, and accordingly the trial court was required to grant Garcia-Torres' motion to suppress the evidence.  I therefore dissent and would reverse the judgment of the trial court and remand this cause for a new trial.