

**FILED**

Aug 31 2016, 9:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

John Mark Vouga
Nicholas Barnes
Vouga & Associates, LLC
Portage, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Howard B. Gutenstein,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | August 31, 2016<br><br>Court of Appeals Case No.<br>46A04-1511-CR-1892<br><br>Appeal from the LaPorte Superior Court<br><br>The Honorable Michael S. Bergerson, Judge<br><br>Trial Court Cause No.<br>46D01-1304-FC-157 |

**Brown, Judge.**

[1] In this interlocutory appeal, Howard B. Gutenstein appeals the trial court's order denying his motion to dismiss and motion to suppress evidence of his blood alcohol concentration. Gutenstein raises three issues which we consolidate and restate as:

I. Whether the trial court abused its discretion in denying his motion to dismiss; and

II. Whether the trial court erred in denying his motion to suppress.

We affirm.

### Facts and Procedural History

[2] Around 2:00 a.m. on April 25, 2013, George Leeth was traveling eastbound on I-94 and observed a gray car later determined to be driven by Gutenstein making unsafe lane movements. Leeth was unable to move around the vehicle, and called 911 to report Gutenstein's behavior. Gutenstein slowed down in the right lane to twenty-five miles per hour, and Leeth activated the hazards on his semi. Gutenstein then stopped his vehicle in the right lane, and Leeth also stopped with his hazards activated. A semi driven by Steve Lunn struck the rear of Leeth's semi.

[3] Indiana State Trooper Rogelio Escutia, a probationary trooper at that time, responded to the scene and observed a semi in the right lane and another semi

on the outside shoulder with heavy damage.[1] Trooper Escutia observed Lunn in the cabin of one of the semis and asked him if he was okay. Lunn was "only able to lift his body up, as he kept bleeding from his mouth and then he went back down." Transcript at 15. Trooper Escutia observed a small passenger car with no physical damage and with its lights off in front of the white semi.

[4] Leeth hobbled towards Trooper Escutia and spoke to him in a clear concise voice. Trooper Escutia then observed Gutenstein on the ditch grass area walking very slowly toward him and being "[j]ust nonchalant." *Id.* at 19-20. As Trooper Escutia spoke to Leeth and Gutenstein, Gutenstein "really didn't say anything," and Leeth was "just doing all the talking and . . . Gutenstein just remained quiet." *Id.* at 20. Trooper Escutia asked Gutenstein what happened, and Gutenstein said: "I'm just sleepy and tired." *Id.* Trooper Escutia asked Gutenstein if he had been drinking, and Gutenstein just said that he was tired. Trooper Escutia smelled the odor of alcohol coming from Gutenstein and observed that Gutenstein "seemed confused" and had "no idea what had happened or transpired at the accident." *Id.* at 32. Gutenstein also had bloodshot eyes that were "kind of glassy" and he spoke with a "very slow draw [sic]." *Id.* at 34.

[5] Trooper Escutia learned that Gutenstein was going "lane to lane," "was not able to let other vehicles pass," and that he almost crashed into the center

---

[1] Trooper Escutia testified that he graduated from the State Academy on December 21, 2013, was an FTO for three months, and that the collision occurred during his first week on solo patrol.

barrier wall. *Id.* at 52. Trooper Escutia determined that Gutenstein stopped his car in the right lane, that Leeth was a concerned driver and stopped to determine "what's going on with this guy in front of me," and then Lunn crashed into Leeth's semi. *Id.* at 38.

[6] Trooper Adam Rubesha, a more experienced trooper, arrived, also smelled alcohol, and told Trooper Escutia to place Gutenstein in handcuffs. Trooper Escutia placed Gutenstein in handcuffs and into the front seat of his patrol vehicle and put the seat belt on him. Trooper Escutia then assisted the other troopers with the investigation at the scene and in helping Lunn, who died at the scene.

[7] At some point, post command told Trooper Escutia that he needed to obtain a blood draw "because it is policy for us to during serious accidents to always get a consent to, for an alcohol test." *Id.* at 24. While in his police vehicle, Trooper Escutia read Gutenstein an implied consent warning. Specifically, Trooper Escutia stated:

> I have reason to believe that you have operated a vehicle that was involved in a fatal or serious bodily injury crash. I must now offer you the opportunity to submit to a chemical test . . . and inform you that your refusal to submit to a chemical test will result in suspension of your driving privileges for one year and is punishable as a Class C Infraction. If you have at least one previous conviction for operating while intoxicated, your refusal to submit to a chemical test, will result of [sic] suspension of your driving privilege for two years . . . and is punishable as a Class A Infarction [sic].

*Id.* at 25-26. Trooper Escutia also informed Gutenstein of his *Miranda* rights. Gutenstein indicated verbally that he understood the implied consent warnings and his *Miranda* rights. Trooper Escutia told Gutenstein that he was going to take him to the hospital for a blood draw, and Gutenstein stated: "[Y]es." *Id.* at 56. Trooper Escutia transported Gutenstein to the hospital.

[8] At the hospital, Trooper Escutia gave Gutenstein a printed sheet of his *Miranda* warning. Trooper Escutia read Gutenstein a form that states "*CHECK EACH BOX AS YOU EXPLAIN IT*." State's Exhibit 1. Under that statement, the form contains a heading titled "***Miranda Warning***," a list of rights with boxes next to them, and a signature line and a witness line. *Id.* Under the heading "***Fatal/SBI Crash Implied Consent Warning***," the following statements are listed:

> I have reason to believe that you have operated a vehicle that was involved in a fatal or serious bodily injury crash.
>
> I must know [sic] offer you the opportunity to submit to a chemical test.
>
> I must inform you that your refusal to submit to a chemical test will result in the suspension of your driving privileges for up to one (1) year and is punishable as a Class C Infraction.
>
> I must inform you that if you have at least one previous conviction for operating while intoxicated, your refusal to submit to a chemical test will result in the suspension of your driving privileges for up to two (2) years and is punishable as a Class A Infraction.

*Id.* Each of the above statements had a box next to it. Under these statements, the form read: "Will you now take a chemical test?" *Id.* The word "YES" was circled. *Id.* Trooper Escutia checked the boxes and placed his signature under the *Miranda* warning and the implied consent warning because he understood the form as requiring that he do so. Trooper Escutia went through these forms with Gutenstein in the phlebotomist's office of the hospital. Trooper Escutia and the phlebotomist then explained to Gutenstein that there was going to be blood drawn from his body. Gutenstein acknowledged that he understood his rights and consented to the blood draw.

[9] At 4:45 a.m., Trooper Escutia filled out a form titled "Law Enforcement Officer's Certification To Physician of Death or Serious Bodily Injury." *Id.*[2] The form, which was signed by Trooper Escutia, stated in part that he was requesting that Julie Whistler obtain a sample of blood pursuant to Ind. Code § 9-30-6-6(g) and that he had probable cause to believe that Gutenstein operated a vehicle while intoxicated, with a controlled substance in his body, or with unlawful blood alcohol content. *Id.*

[10] Shortly before the blood draw, LaPorte County Sheriff's Detective Lowell Scott Boswell arrived at the hospital and observed that Gutenstein had an odor commonly associated with alcoholic beverages "permeating" from his person

---

[2] At the hearing, during cross-examination of Trooper Escutia, Gutenstein's counsel asked: "If you believed you had consent, why did you additionally fill out [the form titled Law Enforcement Officer's Certification To Physician of Death or Serious Bodily Injury]?" Transcript at 42. Trooper Escutia answered: "Because that's how I was instructed to do it by the more experienced trooper, sir." *Id.* at 43.

and that his eyes were glassy. Transcript at 68. Gutenstein was not handcuffed and did not voice any objection or concern when his blood was drawn or at any point. The blood test revealed the presence of alcohol, specifically 0.13% ethanol.

[11]    On April 26, 2013, the State charged Gutenstein with: Count I, operating a motor vehicle while intoxicated causing death as a class C felony; Count II, reckless homicide as a class C felony; and Count III, operating a vehicle while intoxicated as a class A misdemeanor.

[12]    On June 11, 2015, Gutenstein filed a motion to dismiss and a memorandum of law and alleged that the charging informations for Counts I and II were defective because they failed to recite facts that constitute the alleged offenses and that he caused Lunn's death. That same day, he filed a motion to suppress evidence of his blood alcohol concentration and alleged that the police seized a sample of his blood to test for alcohol and other controlled substances without lawful authority. He asserted that the police did not have a warrant, probable cause, or consent to obtain the blood sample. He also alleged that the blood draw was not done for purposes of medical treatment and violated the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution.

[13]    On September 18, 2015, the court held a hearing on Gutenstein's motions. Trooper Escutia and Detective Boswell testified. During Trooper Escutia's testimony, the form including the *Miranda* warning and the implied consent

warning was discussed, and Trooper Escutia testified that he made a mistake by signing on those lines and that "I took it as understanding that as I checked marked it, because I'm the one that read it to him, I was going to sign, sir." *Id.* at 47. On redirect examination, the prosecutor asked Trooper Escutia whether Gutenstein consented to the blood draw, and Trooper Escutia answered: "Yes." *Id.* at 49. Upon questioning by the court, Trooper Escutia testified that he explained the implied consent responsibilities and *Miranda* warnings on two different occasions. He testified that Gutenstein verbally indicated that he understood the implied consent warnings and his rights under *Miranda*. When asked how Gutenstein indicated to him that he understood him, Trooper Escutia answered: "He said, yes." *Id.* at 58.

[14] Trooper Escutia also testified that the police received a dispatch that the individual that was driving the car was walking around the ditch or the canal area of I-94 prior to the crash and was walking away from the accident. The following exchange occurred during the redirect examination of Trooper Escutia:

> Q . . . At that point, and, and when this accident occurred was there any, I think you had testified Mr. Gutenstein was not in the car at the time of the actual crash –
>
> A No.
>
> Q -- between the – okay, he was out on the, on the side of the highway?

A  Yes.

*Id.* at 51-52.  At one point, the court asked Trooper Escutia what Leeth told him, and Trooper Escutia answered:

> [T]he gray Audi was making unsafe lane movements and he was unable to get around the subject's vehicle traffic in the adjacent lane.  He then followed the gray Audi and called 911 to advise that the D3, which is the, Mr. Gutenstein's driving behavior.  As I, as he continued to talk to dispatch and advised the driver here very uh, he slowed down – Mr. Gutenstein's vehicle slowed down in the right lane to 25 miles per hour.  And the witness had stated that he stayed behind the V3, which is the – Mr. Gutenstein's vehicle, with his hazards activated on his semi.
>
> He then advised that the gray Audi stopped and his – stopped his vehicle in the right lane, and then he then attempted to stop behind the gray Audi with his hazards activated.  And he was stopped about 10 feet, and as he attempted to exit his vehicle, he was struck in the rear by Mr. Lunn.

*Id.* at 53-54.

[15]  After the presentation of evidence, Gutenstein's counsel argued the issues raised in his motion to dismiss and motion to suppress.  He contended that Gutenstein's driving behavior could be explained by any number of things including a narcoleptic episode, and stated that he wanted to address an issue that was not in his memorandum of law which was the issue of operation, and he asserted that Gutenstein was not operating his vehicle at the time of the fatal accident.

[16]     The prosecutor stated:

>    I think, and this is the crux of the whole matter is [the] causation
>    issue.  I think we're, we're in agreement on that.  It becomes the
>    issue of, from the testimony that we heard from the officer,
>    basically, the car, we, we all know the car is parked in the, the far
>    right lane.  And it's – it has its lights off.  It's locked.  And he was
>    not in the vehicle at the time. . . .  Because we have to go beyond,
>    and it becomes a legal issue I think.  You know, when you have
>    those facts is, is that foreseeable that, that him parking, is that
>    causation?  Him causing that chain of events?  And, and frankly,
>    I think that's, that's what the Court has to make a determination
>    on, is because of the, the case law I read on the operation, is it
>    enough that he operated his vehicle?  Because we have operation.
>    . . .  It's not a situation where the car is just parked out there.  We
>    know we have that operation.  We have operating while
>    intoxicated.  The issue is, does it end?  When, when does the –
>    when does it end?  When does the operation end?

*Id.* at 91-92.  He later stated: "I know back in 2013 there was an obstruction of

traffic statute that's now been repealed, I think it's in 2014, that may have been

the more appropriate rather than, you know, reckless homicide or the

obstruction of, of traffic would probably have been causing death, because

that's kind of the situation is that, he didn't operate his vehicle, but he put his

vehicle there in the way that it caused a serious accident." *Id.* at 94-95.  After

some discussion, the prosecutor spoke and appeared to refer to statements by

Leeth who did not testify at the hearing.  Specifically, the prosecutor stated:

>    And the, and the timing it – when Mr. Leeth was here, he said
>    something that I thought was very interesting.  He said that he
>    saw Mr. Gutenstein stop his vehicle, turn off the lights, and get
>    out of the car when he was still a half mile behind him.  And, and

that was something that to me when I heard him say that, that was – and I asked him afterwards to talk to his counsel I said, that's, that's new information to me, because I thought he was following him. He said he was following him, I thought he was following him closely, but he's talking about following him even more further back, and that kind of pushes that time back. And he has enough time to get out of his car and talk to him before the accident occurs. So that – and that's the issue, Your Honor, is, is that enough causation? Is him just – the mere presence of him operating his vehicle and parking it there on the highway, is that enough to prove causation? And I think that becomes a legal issue for the Court to make a determination on, because I think the facts are clear. There, there's no issue that Mr. Leeth stopped his vehicle, was able to get out of his car, go up to him and talk to Mr. Gutenstein and then he saw Mr. Lunn's, Lunn's vehicle coming up and he decided to either, either go to the second lane of the highway to get out of the way or go back in his cab? And he chose to go back in his cab, because he wanted to go for the safety of his, of his vehicle versus that he didn't want to prohibit Mr., if Mr. Lunn was to go to the left, instead of going to the right, and Mr. Lunn chose to go to the right. And I think if he'd gone to the left we, we would be in uh, uh, it may have been a fatality of Mr. Leeth, you know, because the accident would have went the other direction, the forces and all that.

So, I think, I think really, it really comes down to a legal issue. Is that a sufficient for the State, him parking his vehicle to cause – is that causation for both, on Counts I and Count II?

*Id.* at 96.

[17]     The court then asked the prosecutor if he was saying Gutenstein's motion to dismiss should be granted or denied. The prosecutor stated that it would leave that to the court's determination, that he could see both sides of the argument,

and that he saw an argument that he could make for causation. When asked by the court what argument he was going to make, the prosecutor stated:

> The argument is that, but for him parking the car there, this would not have occurred. And, and – but, but is that a proper argument? That almost becomes like the negligence argument, that it's, it's gross negligence. And I, and I see under the case law that operation of the vehicle, that you need to operate – you have to show causation by the operation of the vehicle.

*Id.* at 97. After further discussion, the prosecutor stated that he did not want the court to dismiss the case.

[18] On September 29, 2015, the court denied Gutenstein's motions. The court's order states in part:

### LEGAL CONCLUSIONS

1. Count I of the Charging Information is not defective under I.C. 35-34-1-4 because it does recite facts that constitute the alleged offense. See "Facts alleged by State" in Defendant's Memorandum of Law.

2. Count II of the Charging Information is not defective under I.C. 35-34-1-4 because it does recite facts that constitute the alleged offense. See "Facts alleged by State" in Defendant's Memorandum of Law.

3. The factual allegations, if taken as true, support the theory that the defendant's conduct: a) was the actual and proximate cause of the accident that resulted in Mr. Lunn's death (Bowman v. State 564 N.E. 2nd 309), and b) that the result

was the "natural and probable" consequence of the defendant's conduct, ie. foreseeable. Id.

4. The alleged facts in support of Count II, Reckless Homicide, are sufficient to survive the Motion to Dismiss. The facts alleged in the charging information are not the basis upon which a jury convicts; they are allegations supporting the charge. See "Facts Alleged by State" in Defendant's memorandum of Law.

5. The implied consent statutes are designed to give law enforcement officers the authority to perform chemical tests on drivers who are either thought to be intoxicated or those who have been involved in an accident involving a fatality or serious bodily injury. *Abney v. State*, 811 N.E.2d 415, 419-420 (Ind. [Ct. App.] 2004)[, *adopted by* 821 N.E.2d 375 (Ind. 2005)].

6. Under chapter six of the Indiana Implied Consent laws, a person impliedly consents to a chemical test through the operation of a vehicle. *See* I.C. 9-30-6-1.

7. Trooper Escutia did not lack probable cause to conduct a chemical test. The Defendant was involved in an accident in which a death occurred; an odor of alcohol was detected and the defendant's eyes were glassy. Defendant was observed wandering near the scene seemingly indifferent to what had occurred.

8. Regardless of Trooper Escutia's failure to obtain the written consent of the defendant, the evidence supports the conclusion that the defendant knowingly and voluntarily consented to the blood test both in word and in deed.

9. At no time on April 25, 2014 did the defendant indicate that he suffered from narcolepsy.

Appellant's Appendix at 99-100.

## *Discussion*

### I.

[19] The first issue is whether the trial court abused its discretion in denying Gutenstein's motion to dismiss Counts I and II. We review a trial court's ruling on a motion to dismiss a charging information for an abuse of discretion, which occurs only if a trial court's decision is clearly against the logic and effect of the facts and circumstances. *An-Hung Yao v. State*, 975 N.E.2d 1273, 1276 (Ind. 2012). A trial court also abuses its discretion when it misinterprets the law. *Id.*

[20] At the outset, we observe that Gutenstein's motion to dismiss alleged that Counts I and II must be dismissed under Ind. Code § 35-34-1-4(a)(5) which provides that "[t]he court may, upon motion of the defendant, dismiss the indictment or information upon any of the following grounds . . . [t]he facts stated do not constitute an offense." In his memorandum of law in support of his motion to dismiss, he also referenced Ind. Code § 35-34-1-4(a)(11), which provides that the court may dismiss the indictment or information upon "[a]ny other ground that is a basis for dismissal as a matter of law."

[21] In deciding whether an information fails to state facts constituting an offense, we take the facts alleged in the information as true. *Pavlovich v. State*, 6 N.E.3d 969, 974 (Ind. Ct. App. 2014), *trans. denied*. Facts permitted to be raised in a

motion to dismiss a charging information generally concern only pre-trial procedural matters, such as jurisdictional issues, double jeopardy, collateral estoppel, and the like. *Id.* (citing *State v. King*, 502 N.E.2d 1366, 1369 (Ind. Ct. App. 1987)). "Questions of fact to be decided at trial or facts constituting a defense are not properly raised by a motion to dismiss." *State v. Isaacs*, 794 N.E.2d 1120, 1122 (Ind. Ct. App. 2003). "It is only when an information is facially deficient in stating an alleged crime that dismissal for failure to state an offense is warranted." *Pavlovich*, 6 N.E.3d at 969; *see also Isaacs*, 794 N.E.2d at 1123 (holding dismissal of charge was warranted where information alleged defendant operated a vehicle with a schedule I or II controlled substance in the body, but substances alleged to be in defendant's body were schedule IV controlled substances or non-controlled substances, and it was not a crime to operate a vehicle with such substances in the body).

[22] Gutenstein's arguments address the specificity of the charging informations, whether his conduct as alleged could constitute reckless homicide, causation, and his operation of the vehicle. We address these arguments separately.

A. *Specificity*

[23] At the time of the offense and charging information, Ind. Code § 35-34-1-2 provided in part:

> (a) The indictment or information shall be in writing and allege the commission of an offense by:

> * * * * *

(2) stating the name of the offense in the words of the statute or any other words conveying the same meaning;

(3) citing the statutory provision alleged to have been violated, except that any failure to include such a citation or any error in such a citation does not constitute grounds for reversal of a conviction where the defendant was not otherwise misled as to the nature of the charges against the defendant;

(4) setting forth the nature and elements of the offense charged in plain and concise language without unnecessary repetition;

(5) stating the date of the offense with sufficient particularity to show that the offense was committed within the period of limitations applicable to that offense;

(6) stating the time of the offense as definitely as can be done if time is of the essence of the offense . . . .

\* \* \* \* \*

(d) The indictment or information shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It need not contain a formal commencement, a formal conclusion, or any other matter not necessary to the statement. Presumptions of law and matters of which judicial notice is taken need not be stated.

(Subsequently amended by Pub. L. No. 85-2013, § 115 (eff. July 1, 2013)).

[24]     Gutenstein argues that the State failed to allege facts constituting the offenses charged and that the clear logic and effect of the facts and circumstances compel the conclusion that he was improperly charged. He asserts that the charging information for Count I was facially defective because it failed to set forth the approximate time at which he was alleged to have operated his motor vehicle, as well as the time the accident occurred as required under Ind. Code § 35-34-1-2(a)(6). He contends that this information is critical as the State is required to show that his blood sample was collected within three hours from the time he was operating his motor vehicle in order to presumptively relate his chemical test results back to the alleged time of operation. He also posits that the charging information did not contain facts to show operation of a vehicle, signs of intoxication, the actions that caused Lunn's death, or even allege that he was operating a motor vehicle that was involved in an accident. The State's position is that the charging informations were sufficiently specific and that, even if a deficiency in the pleading existed, then amendment of the information and not dismissal of the charge would be the appropriate remedy.

[25]     As to Count II, Gutenstein concedes that the charging information appears to meet the minimum requirements of Ind. Code § 35-34-1-2(a), but asserts that the information still fails to state the essential facts alleged in support of the charged offense as required under Ind. Code § 35-34-1-2(d). He argues that the charging information in Count II is so fatally defective that it is impossible for him to discern what conduct the State is alleging to be reckless.

[26] "The State is not required to include detailed factual allegations in a charging information." *Laney v. State*, 868 N.E.2d 561, 567 (Ind. Ct. App. 2007), *trans. denied*. "An information that enables an accused, the court, and the jury to determine the crime for which conviction is sought satisfies due process. Errors in the information are fatal only if they mislead the defendant or fail to give him notice of the charge filed against him." *Dickenson v. State*, 835 N.E.2d 542, 550 (Ind. Ct. App. 2005) (citations and quotation marks omitted), *trans. denied*. "[W]here a charging instrument may lack appropriate factual detail, additional materials such as the probable cause affidavit supporting the charging instrument may be taken into account in assessing whether a defendant has been apprised of the charges against him." *State v. Laker*, 939 N.E.2d 1111, 1113 (Ind. Ct. App. 2010), *trans. denied*.

[27] In Count I, operating a motor vehicle while intoxicated causing death as a class C felony, the State alleged:

> On or about the 25th day of April, 2013, at or about Mile Marker 43 in the eastbound lane of I-94, LaPorte County, State of Indiana, Howard B. Gutenstein did cause the death of another person, namely Steve Lunn, while operating a motor vehicle with at least eight-hundredths gram (0.08) of alcohol concentration in the defendant's blood, to-wit: .13% serum, plasma or blood.

Appellant's Appendix at 13 (italics, capitalization, and bold removed). At the time of the offense, Ind. Code § 9-30-5-5 provided in part that "[a] person who causes the death of another person when operating a vehicle . . . with an alcohol concentration equivalent to at least eight-hundredths (0.08) gram of alcohol per

. . . one hundred (100) milliliters of the person's blood . . . commits a Class C felony."[3]

[28] We cannot say that the charging information for Count I was facially deficient. To the extent that Gutenstein asserts that the State did not provide the time that he operated the vehicle, we observe that he argues, without citation to the record, that "the State chose not to file a probable cause affidavit in support of the charging information; thus, the charging information alone must contain a statement of facts constituting the offenses charged in Counts I and II." Appellant's Brief at 30. While the record does not contain a copy of the probable cause affidavit, the record suggests that it was filed along with the charging information. The second page of the charging information states: "This affidavit having been filed in open court this 26th day of April, 2013, together with supporting testimony of Det. Scott Boswell with a finding thereon of probable cause for issuance of a warrant(s) for the arrest" of Gutenstein. Appellant's Appendix at 14. Further, Gutenstein filed a Motion to Preserve Evidence in July 2013, which stated: "In reading the information *and the probable cause affidavit filed with it . . . .*" *Id.* at 28 (emphasis added). As noted, we have previously reviewed an attached probable cause affidavit in addressing whether a charging information is defective. *See Laker*, 939 N.E.2d at 1113 ("Here, the underlying allegations reveal two potential subject vehicles—a

---

[3] Subsequently amended by Pub. L. No. 158-2013, § 161 (eff. July 1, 2014); and Pub. L. No. 26-2016, § 1 (eff. July 1, 2016).

Lexus and a farm tractor. None of the State's charges specifies which of the vehicles Laker is alleged to have illegally driven. However, the attached probable cause affidavit and summons tickets clarify that the State's charges are based specifically on Laker's farm tractor. We therefore find no fatal uncertainty in the State's charging information."). While the fact that Gutenstein did not include the probable cause affidavit in his appendix does not result in waiver,[4] he fails to cite to the record for the assertion that the probable cause affidavit was not filed despite the record, including his own admission suggesting otherwise, and he does not assert that the probable cause affidavit did not include a time that he allegedly operated the vehicle. Moreover, as pointed out by the State, the evidence presented at the hearing provided details regarding the time of the crash and the time at which Gutenstein's blood was drawn. Further, Gutenstein's memorandum in support of his motion to dismiss states under the heading "Facts Alleged by the State" that he was driving on I-94 at approximately 2:00 a.m. and refers to an Indiana State Police Incident Report. Appellant's Appendix at 69 (capitalization, underlining, and bold removed).

[29] In Count II, reckless homicide as a class C felony, the State alleged that "[o]n or about the 25th day of April 2013, at or about the Mile Marker 43 in the Eastbound Lane I-94, LaPorte County, State of Indiana, Howard B. Gutenstein

---

[4] Ind. Appellate Rule 49(B) provides that "[a]ny party's failure to include any item in an Appendix shall not waive any issue or argument."

did recklessly kill another human being, to-wit: Steve Lunn." *Id.* at 13 (capitalization and bold removed). At the time of the offense, Ind. Code § 35-42-1-5 provided that "[a] person who recklessly kills another human being commits reckless homicide, a Class C felony."[5] The charging information for Count II tracks the language of the relevant statute and alleges the commission of every necessary element of the crime. Gutenstein also does not assert that the probable cause affidavit, which he admitted to the trial court was filed with the charging information, did not include additional facts. We cannot say that the charging information for Count II was facially deficient or that the trial court abused its discretion by denying Gutenstein's motion to dismiss on this basis.

B. *Reckless Homicide*

[30] Gutenstein asserts that the facts alleged by the State fail to support a reasonable inference that he recklessly killed Lunn as a matter of law. He contends that if the State is alleging that leaving his parked car on the highway as he stood along the side of the road is a reckless act, then his conduct did not substantially deviate from acceptable standards of conduct because Leeth also parked his semi in the same lane and exited his vehicle.[6] The State argues that a jury could conclude that Gutenstein's conduct was reckless and caused Lunn's death.

---

[5] Subsequently amended by Pub. L. No. 158-2013, § 415 (eff. July 1, 2014).

[6] Gutenstein asserts that the State admitted that its own allegations merely support a finding of negligence or gross negligence and that a charge related to the obstruction of traffic may have been the more appropriate

Ind. Code § 35-41-2-2 provides that "[a] person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." "Proof that an accident arose out of the inadvertence, lack of attention, forgetfulness or thoughtfulness of the driver of a vehicle, or from an error of judgment on his part, will not support a charge of reckless homicide." *Whitaker v. State*, 778 N.E.2d 423, 425 (Ind. Ct. App. 2002) (quoting *Beeman v. State*, 232 Ind. 683, 690, 115 N.E.2d 919, 922 (1953)). We have previously held:

> [R]elatively slight deviations from the traffic code, even if they technically rise to the level of "reckless driving," do not necessarily support a reckless homicide conviction if someone is subsequently killed. Some gross deviations from the traffic code, however, may under certain circumstances be such a substantial departure from acceptable standards of conduct that they will support a reckless homicide conviction, such as ignoring traffic signals at a high rate of speed, driving on a dark road at night without headlights, or intentionally crossing the centerline without a legitimate reason for doing so. Speed may support a reckless homicide conviction, but only greatly excessive speeds, such as twenty or more miles per hour over the posted speed limit, or where inclement weather and poor road conditions render higher speeds greatly unreasonable.

charge. We cannot say that the prosecutor's comments support Gutenstein's statement that the State admitted that its allegations merely support a finding of negligence or gross negligence, particularly where the prosecutor ultimately stated that he did not want the court to dismiss the case.

*Id.* at 426.

[32] Based upon the charging information and the facts developed at the hearing, we cannot say that a driver who stops his car in the middle of a travel lane of an interstate highway at 2:00 a.m. and turns off the lights does not act recklessly as a matter of law. Accordingly, we cannot say that the trial court abused its discretion in denying Gutenstein's motion to dismiss on this basis.[7]

C. *Causation*

[33] Gutenstein argues that the trial court erroneously interpreted and applied the law as it relates to causation with respect to both Counts I and II, and that the clear logic and effect of the facts and circumstances before the trial court fail as a matter of law to support a reasonable inference that his conduct was the legal cause of the collision. He argues that the State cannot show that he was the proximate cause of the collision where he was not operating his motor vehicle

---

[7] Gutenstein discusses *DeVaney v. State*, 259 Ind. 483, 288 N.E.2d 732 (1972), and *Whitaker v. State*, 778 N.E.2d 423 (Ind. Ct. App. 2002). We find that these cases are distinguishable and do not require reversal. In *DeVaney*, the Court held: "Can the mere fact that it was shown that appellant crossed the center line while driving be considered driving 'with reckless disregard for the safety of others'? We think not. Such an occurrence could be completely accidental." 259 Ind. at 493, 288 N.E.2d at 738. The Court also held: "Can the mere fact that defendant was driving in close proximity to the time he had been drinking be sufficient to find 'reckless disregard for the safety of others'? We think not. Although the evidence of intoxication could certainly be considered by the jury, *see Patton v. State* (1962), 242 Ind. 477, 179 N.E.2d 867, that alone is not sufficient to convict for reckless homicide." *Id.* The Court concluded that the facts that the defendant crossed the center line and was intoxicated were insufficient to constitute reckless homicide. *Id. Whitaker* involved "a non-intoxicated, well-rested truck driver who drove slightly above the speed limit and arguably followed too closely behind another vehicle on a clear, dry day, with undeniably tragic results." 778 N.E.2d at 428. We held that "where there is evidence of non-excessive speeding and some inconclusive indication of failing to maintain a proper interval, this is insufficient to establish guilt of reckless homicide beyond a reasonable doubt for a death resulting from a motor vehicle collision." *Id.*

at the time of the collision, his vehicle was not physically involved in the collision at all, and the collision resulted directly from Lunn's act of driving into the back of Leeth's semi.

[34] The State's position is that the trial court properly refused Gutenstein's request because the factual issues he raised should be first addressed by a jury, and that a jury could conclude that both Leeth and Lunn's actions were reasonably foreseeable responses to Gutenstein's conduct. The State asserts that "[e]ven if enough time elapsed that one can infer that Lunn could have stopped if he had been paying close attention to road conditions, which cannot be discerned from the present record, a jury must still decide whether Lunn's inattention was so unforeseeable as to be an intervening cause relieving Defendant of responsibility." Appellee's Brief at 38. The State contends that Gutenstein is not entitled to have his charges dismissed merely because he may raise some evidence suggesting another cause contributed to the fatal collision.

[35] The Indiana Supreme Court discussed causation in *Abney v. State*, 766 N.E.2d 1175 (Ind. 2002). In that case, the Court rejected the argument that proof that the defendant's conduct was a contributing cause was all that was necessary to sustain a conviction under Ind. Code § 9-30-5-5 and held:

> As we stated in *Micinski* [*v. State*, 487 N.E.2d 150 (Ind. 1986),] "[a]nalysis of [Ind. Code § 9-30-5-5] should focus on the driver's acts. . . . If the driver's conduct caused the injury, he commits the crime; if someone else's conduct caused the injury, he is not guilty." 487 N.E.2d at 154. This is simply a short-handed way of stating the well-settled rule that the State must prove the

defendant's conduct was a proximate cause of the victim's injury or death. *Boswell v. State*, 250 Ind. 607, 609, 238 N.E.2d 283, 285 (1968) (citing, inter alia, *Dunville v. State*, 188 Ind. 373, 379, 123 N.E. 689, 691 (1919)); *Warner v. State*, 577 N.E.2d 267, 270 (Ind. Ct. App. 1991). This was the basis for Abney's defense that, although his vehicle struck Heffernan's body, the evidence tended to show that another vehicle struck Heffernan first and threw Heffernan into Abney's vehicle. If the trier of fact accepts Abney's scenario, Abney's driving may not have been a proximate cause of Heffernan's death.

766 N.E.2d at 1177-1178.[8] We have previously held that "proximate cause questions are often couched in terms of 'foreseeability'; an actor is not held responsible for consequences which are unforeseeable. In Indiana, a result is deemed foreseeable if it is a 'natural and probable consequence' of the act of the defendant. *Bowman v. State*, 564 N.E.2d 309, 313 (Ind. Ct. App. 1990) (quoting *Outlaw v. State*, 484 N.E.2d 10, 13 (Ind. 1985)), *summarily aff'd in relevant part and vacated in part*, 577 N.E.2d 569 (Ind. 1991).

[36] The Court in *Abney* suggested that the issue of causation was one for the trier of fact by stating "[i]f the trier of fact accepts Abney's scenario, Abney's driving may not have been a proximate cause of Heffernan's death." 766 N.E.2d at 1178. *See also Rippy v. State*, 493 N.E.2d 477, 480 (Ind. Ct. App. 1986) ("Rippy claims that Hogan's own intoxication was an intervening cause of the accident. However, causation is a question for the trier of fact. *Pollard* [*v. State*, 439

---

[8] The version of Ind. Code § 9-30-5-5 addressed in *Abney* provided that a person who violates Ind. Code § 9-30-5-1 commits a Class C felony "if the crime results in the death of another person." 766 N.E.2d at 1177.

N.E.2d 177 (Ind. Ct. App. 1982), *reh'g denied*].  Here, as in *Micinski*, Rippy presented a theory that the victim was at fault.  As in *Micinski*, the trier of fact was entitled to reject Rippy's theory of defense based upon the evidence presented."), *reh'g denied*, *trans. denied*.

[37]   The record supports that Gutenstein stopped his vehicle in the right lane of I-94 shortly after 2:00 a.m. and turned off the lights on his vehicle, and Leeth stopped his semi and activated his hazard lights in an attempt to warn other drivers.  We cannot say that the trial court abused its discretion in denying Gutenstein's motion to dismiss on this basis.

D.  *Operating*

[38]   Gutenstein argues that the court erred in failing to dismiss Count I, operating a motor vehicle while intoxicated causing death, because he was not operating his vehicle at the time of the collision, and the plain language of Ind. Code § 9-30-5-5 requires a showing that the defendant was, at the very least, operating his vehicle at the time of the accident.  The State contends that the statute requires only that the person's state of intoxication coincide with his operation of the vehicle and that the operation cause the death of another person.

[39]   At the time of the offense, Ind. Code § 9-13-2-117.5 provided that "[o]perate" "means to navigate a vehicle."[9]  Navigate is generally defined as "[t]o plan,

---

[9] Subsequently amended by Pub. L. No. 85-2013, § 16 (eff. July 1, 2013); Pub. L. No. 259-2013, § 4 (eff. July 1, 2013); and Pub. L. No. 198-2016, § 138 (eff. July 1, 2016).

record, and control the course and position of . . . ." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1173 (4th ed. 2006).

[40] As noted by the State on appeal, there is no clear evidence in the record regarding how much time elapsed between the time Gutenstein parked his car on I-94 and the time Lunn's semi struck Leeth's semi and that no one who was present at the time of the accident testified at the hearing. Trooper Escutia testified that the police received a dispatch that the individual who was driving the car was walking around the ditch or the canal area of I-94 prior to the crash and was walking away from the accident and that Leeth told him that the car stopped, that he stopped his semi, and that Lunn struck his semi as he attempted to exit his semi. However, the prosecutor suggested that Gutenstein exited his vehicle and that Leeth had completely exited his vehicle and talked to Gutenstein prior to the collision. In his reply brief, while Gutenstein argues that he was not operating his vehicle at the time of the collision and cites to the prosecutor's comments to support his assertion that Leeth exited his vehicle, spoke to Gutenstein, saw Lunn approaching at an unsafe speed, and ran back to his semi prior to the collision, he also states in another section that the facts alleged "fail to establish either the time at which Mr. Gutenstein last operated his vehicle or the time at which the accident occurred." Appellant's Reply Brief at 21.

[41] Even if Gutenstein was not inside his vehicle at the moment when Lunn's semi struck Leeth's semi, we cannot say that this fact standing alone means, as a

matter of law, that he was not "operating" the vehicle for purposes of the statute.

[42] At least under certain circumstances, other courts have held that a person who uses a motor vehicle and places that vehicle in a position posing a significant risk of causing a collision constitutes operating a vehicle. *See People v. Wood*, 538 N.W.2d 351, 353 (Mich. 1995) (concluding that "'operating' should be defined in terms of the danger the operating under the influence of liquor statute seeks to prevent: the collision of a vehicle being operated by a person under the influence of intoxicating liquor with other persons or property. Once a person using a motor vehicle as a motor vehicle has put the vehicle in motion, or in a position posing a significant risk of causing a collision, such a person continues to operate it until the vehicle is returned to a position posing no such risk."); *People v. Lechleitner*, 804 N.W.2d 345, 347-348 (Mich. Ct. App. 2010) (addressing statutes that set forth penalties for a person who "operates a motor vehicle" while intoxicated "and by the operation of that motor vehicle causes the death of another person," define "operate" and "operating" as "being in actual physical control of a vehicle," and "operator" as "every person, other than a chauffeur, who is in actual physical control of a motor vehicle upon a highway," and holding that "[t]he statute does not require that the defendant's vehicle be in motion at the time of the accident, but rather that the victim's death be caused by the defendant's operation of the vehicle while intoxicated. In this case, defendant was intoxicated, operated his vehicle, and crashed it,

with the result that it sat in the middle of the freeway at night creating a risk of injury or death to others."), *appeal denied*.

[43] Under the circumstances we cannot say that the trial court abused its discretion by denying Gutenstein's motion to dismiss on this basis.

## II.

[44] The next issue is whether the trial court erred in denying Gutenstein's motion to suppress. Gutenstein argues that he never gave his express consent to search and the State failed to prove, under the totality of the circumstances, that it obtained his knowing and voluntary consent. He asserts that the coercion that renders his consent involuntary "arises from an impermissibly intimidating environment" and that his "'so-called consent' can amount to no more than a passive submission to the supremacy of law." Appellant's Brief at 15. He contends that he was taken into custody before Trooper Escutia's request for consent, that the trial court's legal conclusions erroneously presume that the implied consent statute authorizes a warrantless blood draw in all cases involving a fatal collision, and that the court failed to appropriately analyze whether his consent was freely and voluntarily given under the totality of the circumstances. He asserts that the implied consent laws are administrative in nature and do not lessen the Fourth Amendment requirement that warrantless blood draws are justified only by proof of either a knowing and voluntary consent or the existence of both probable cause and exigent circumstances, and that the exigent circumstances exception does not justify the blood draw.

[45] The State maintains that the trial court properly denied Gutenstein's motion to suppress because he consented to the blood draw and, even if he had not, police had lawful authority to take a nonconsensual blood sample under the circumstances. The State asserts that the fact that Gutenstein did not sign the forms waiving his rights and giving consent was only because Trooper Escutia, who was a new officer, misunderstood the forms and believed he was required to sign them himself to affirm that Gutenstein had been read, understood, and waived his rights and gave consent to the blood draw. The State also argues that the police presence at the scene was in response to a fatal accident involving two semis on the interstate and police attention was focused on Lunn and the accident scene. The State further posits that the fact the police post informed Trooper Escutia that he needed to obtain a blood sample from Gutenstein did not influence the voluntariness of the consent because there was no evidence that Trooper Escutia conveyed the message to Gutenstein. Finally, the State notes that the record indicates that, other than a few preliminary questions about the accident, Trooper Escutia only spoke to Gutenstein as necessary to read him his rights, confirm Gutenstein understood, and obtain his consent.

[46] The admission of evidence is entrusted to the trial court's sound discretion. *Robinson v. State*, 5 N.E.3d 362, 365 (Ind. 2014). "We review a trial court's denial of a defendant's motion to suppress deferentially, construing conflicting evidence in the light most favorable to the ruling, but we will also consider any substantial and uncontested evidence favorable to the defendant." *Id.* "We

defer to the trial court's findings of fact unless they are clearly erroneous, and we will not reweigh the evidence." *Id.* "When the trial court's denial of a defendant's motion to suppress concerns the constitutionality of a search or seizure, however, it presents a question of law, and we address that question de novo." *Id.*

A. *Fourth Amendment*

[47] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

[48] The taking of a blood sample is a search. *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2173 (2016). Normally, the Fourth Amendment is satisfied when police obtain a warrant. *Garcia-Torres v. State*, 949 N.E.2d 1229, 1237 (Ind. 2011). A warrant is not required, however, when there is consent to search. *Garcia-Torres*, 949 N.E.2d at 1237. Consent to search is valid when it is given voluntarily, and voluntariness is a question of fact determined from the totality of the circumstances. *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041 (1972)). Voluntariness is not vitiated merely because the defendant is in custody. *Id.* (quoting *United States v. Watson*, 423 U.S. 411, 424, 96 S. Ct.

820 (1976)). Although a failure to provide *Miranda* warnings is a factor to be considered in the totality of the circumstances analysis, it is not dispositive. *Id.* The Fourth Amendment does not require a *Miranda* warning before officers ask for consent to search. *Id.* "It is well established that a search is reasonable when the subject consents and that sometimes consent to a search need not be express but may be fairly inferred from context." *Birchfield*, 136 S. Ct. at 2185 (citations omitted).

[49] To the extent Gutenstein argues that Trooper Escutia asserted implicit and unlawful claims of authority over him through continuing violations of his Fourth Amendment rights, we disagree. Gutenstein contends that Trooper Escutia patted him down and "removed his keys from his left pants pocket, without an explanation or a request for consent, and used them to unlock Mr. Gutenstein's parked car, open the glove compartment, and take Mr. Gutenstein's vehicle registration." Appellant's Brief at 18 (citing Transcript at 50-51). The portion of the transcript cited by Gutenstein indicates that Trooper Escutia testified that the keys were located in Gutenstein's left pocket of his pants, but does not indicate that Trooper Escutia patted Gutenstein down, removed the keys from his pocket, or failed to ask Gutenstein for his consent to unlock his car or access the glove compartment.

[50] Gutenstein also contends that Trooper Escutia illegally seized him when he placed him in the patrol vehicle because he did not have probable cause to arrest him. Gutenstein posits that "[b]y his own admission, Trooper Escutia's [sic] determined that he had probable cause to arrest Mr. Gutenstein based

solely on the odor of alcohol and the fact that there had been a fatal collision."
Appellant's Brief at 17 (citing Transcript at 35). The portion of the transcript
cited by Gutenstein indicates that Trooper Escutia based his finding of probable
cause on the two facts mentioned by Gutenstein, as well as his observation that
Gutenstein may have been under the influence of alcohol. During direct
examination of Trooper Escutia, the following exchange occurred:

> Q . . . So then basically your probable cause at the scene was
> that – for the, for the blood test was the fatality at the scene or the
> serious bodily injury, plus your observation that he may have
> been under the influence of alcohol?
>
> A And his odor, sir.
>
> Q And his – that's what I mean, the odor?
>
> A Yes.

Transcript at 35. During cross-examination, Gutenstein's counsel questioned
Trooper Escutia regarding the form titled "Law Enforcement Officer's
Certification To Physician of Death or Serious Bodily Injury," which stated that
Trooper Escutia had probable cause to believe that Gutenstein operated a
vehicle while intoxicated. State's Exhibit 1. Trooper Escutia testified that he
signed his name to the form certifying that he had probable cause to believe that
Gutenstein had committed the act of operating while intoxicated based upon
his observing the odor of alcoholic beverages and his behavior at the crash
scene including "how he was walking slow," "his slow draw [sic]," his

bloodshot and glassy eyes, and his "ability to be nonchalant and unconcerned for what had just happened." Transcript at 44. We cannot say that Trooper Escutia did not have probable cause to place Gutenstein in his patrol vehicle. *See State v. Gilbert*, 997 N.E.2d 414, 417 (Ind. Ct. App. 2013) (holding that an officer's detection of a strong odor of alcohol coming from the defendant and observation that the defendant ran a stop sign and stumbled while attempting to exit his vehicle were sufficient to constitute probable cause and that the defendant's arrest and transportation to the roll call site did not violate his rights under the Fourth Amendment).

[51] While Trooper Escutia placed Gutenstein in handcuffs and in the front seat of his police vehicle, we cannot say that this act rendered Gutenstein's consent involuntary. The record reveals that Trooper Escutia read Gutenstein his *Miranda* rights and the implied consent warning while he was in the patrol vehicle. Specifically, Trooper Escutia informed Gutenstein that he had the opportunity to submit to a chemical test and of the consequences for failing to take the test. Trooper Escutia testified that Gutenstein verbally indicated that he understood his rights under *Miranda* and the implied consent warnings. Trooper Escutia told Gutenstein that he was going to take him to the hospital for a blood draw, and Gutenstein stated: "[Y]es." Transcript at 56.

[52] At the hospital, Trooper Escutia gave Gutenstein a printed sheet of the *Miranda* warning and read and went through a form containing a *Miranda* warning and an implied consent warning with him. A part of the form again informed Gutenstein that he had the opportunity to submit to a chemical test and

informed him of the consequences of refusing. Trooper Escutia and the phlebotomist explained to Gutenstein that there was going be blood drawn from his body. Trooper Escutia testified that Gutenstein acknowledged that he understood his rights and consented to the blood draw. Gutenstein was not handcuffed and did not voice any objection or concern when his blood was drawn.

[53] Under the circumstances, we conclude that Gutenstein's consent was voluntary. Accordingly, the blood draw was not a violation of the Fourth Amendment. *See Garcia-Torres*, 949 N.E.2d at 1237 (holding that the defendant consented to a cheek swab where the officer described the procedure and asked defendant if it was okay, the defendant answered "no problem," the defendant opened his mouth and cooperated and was helpful through the entire procedure); *Cochran v. State*, 771 N.E.2d 104, 108 (Ind. Ct. App. 2002) (holding that the trial court properly denied the defendant's motion to suppress his chemical test results where the defendant consented to the chemical testing), *trans. denied*.[10]

---

[10] Gutenstein cites *Thurman v. State*, 602 N.E.2d 548 (Ind. Ct. App. 1992), *trans. denied*, and argues that this case compels the same conclusion. In *Thurman*, five or six police officers swooped in on the defendant and his companions, blocking their exit and ordering them out of a vehicle, and the defendant and the others were then forced to keep their hands on the vehicle while each one was patted down. 602 N.E.2d at 552. A detective later testified that he asked the defendant for permission to remove paperwork out of the glove compartment and the defendant consented. *Id.* On appeal, the court noted that the consent occurred while the defendant was surrounded by five other officers and still being forced to keep his hands on the vehicle and was not advised of his *Miranda* rights nor informed in any way that he could refuse the detective's request. *Id.* The court concluded that "[g]iven this intimidating atmosphere, [the defendant's] consent was merely submission to the supremacy of the law rather than a voluntary relinquishment of a known right." *Id.* at 552. We find *Thurman* distinguishable.

Gutenstein also argues that "the trial court's conclusions suggest that the State bear[s] the burden of proving a knowing and voluntary consent only where it first fails to establish compliance with the implied consent

C. *Article 1, Section 11*

Article 1, Section 11 of the Indiana Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

Although its text mirrors the federal Fourth Amendment, we interpret Article 1, § 11 of our Indiana Constitution separately and independently. *Robinson*, 5 N.E.3d at 368. "When a defendant raises a Section 11 claim, the State must show the police conduct 'was reasonable under the totality of the circumstances.'" *Id.* (quoting *State v. Washington*, 898 N.E.2d 1200, 1205-1206 (Ind. 2008), *reh'g denied*). "We consider three factors when evaluating reasonableness: '1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.'" *Id.* (quoting *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005)).

---

statute." Appellant's Brief at 19. The trial court's order states in part: "Regardless of Trooper Escutia's failure to obtain the written consent of the defendant, the evidence supports the conclusion that the defendant knowingly and voluntarily consented to the blood test both in word and in deed." Appellant's Appendix at 100. Given that the trial court found that Gutenstein consented to the blood draw and we cannot say that the trial court abused its discretion in doing so, we need not address the impact of the implied consent statute.

[56] Gutenstein contends that the degree of suspicion is moderate at best given that he was not questioned about and never admitted to his operation of his motor vehicle, he never admitted to drinking, and there was no evidence that either he or his vehicle was actually involved in the collision, and that the intrusiveness of the search is high where it involves a nonconsensual warrantless blood draw. As for the extent of law enforcement needs, Gutenstein maintains that there was no evidence of any special needs of law enforcement to justify a nonconsensual warrantless blood draw. The State's position is that the blood draw was reasonable under the totality of the circumstances.

[57] We consider "the degree of concern, suspicion, or knowledge that a violation has occurred." *Litchfield*, 824 N.E.2d at 361. When Trooper Escutia arrived at the scene he discovered a semi with heavy damage and a severely injured Lunn inside. He learned that the vehicle driven by Gutenstein had previously made unsafe lane movements, slowed down to twenty-five miles per hour, and then stopped in the right lane of I-94. Gutenstein walked very slowly toward him and when Trooper Escutia asked him if he had been drinking, Gutenstein said that he was just tired. Trooper Escutia smelled the odor of alcohol coming from Gutenstein and observed that he "seemed confused," had "no idea what had happened or transpired at the accident," had bloodshot eyes that were "kind of glassy," and he spoke with a "very slow draw [sic]." Transcript at 32, 34. We conclude that the degree of concern, suspicion, or knowledge that a violation had occurred was high.

[58] Regarding the degree of intrusion, the record reveals that Trooper Escutia twice informed Gutenstein of his *Miranda* rights and Indiana's implied consent law, and informed him of the opportunity to submit to a chemical test. Gutenstein verbally indicated that he understood his rights and the implied consent warnings. Trooper Escutia and the phlebotomist explained to Gutenstein that there was going to be blood drawn from his body. He consented to the blood draw and did not voice any objection or concern when his blood was drawn. Under these circumstances, this degree of intrusion was not high.

[59] We note that the Indiana Supreme Court has observed that few Hoosiers would dispute the heartbreaking effects of drunk driving in our state and that law enforcement has a strong interest in preventing crashes involving alcohol-impaired drivers. *See Robinson*, 5 N.E.3d at 368; *see also Frensemeier v. State*, 849 N.E.2d 157, 164 (Ind. Ct. App. 2006) (addressing a defendant's claim that a blood draw violated Article 1, Section 11 of the Indiana Constitution, and observing that the law enforcement needs were great in this instance, given the desire to remove intoxicated drivers from our highways and the motor vehicle accident resulted in injuries to both drivers), *reh'g denied*, *trans. denied*. Under the totality of the circumstances, we conclude that the blood draw was reasonable and did not violate Gutenstein's rights under Article 1, Section 11 of the Indiana Constitution.

## *Conclusion*

[60] For the foregoing reasons, we affirm the trial court's denial of Gutenstein's motion to dismiss and motion to suppress.

Affirmed.

Baker, J., and May, J., concur.