



FILED

Oct 03 2018, 3:47 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE

# Indiana Supreme Court

Supreme Court Case No. 18S-CR-488

## Monica Dycus

*Appellant (Defendant below),*

—v—

## State of Indiana

*Appellee (Plaintiff below).*

Argued: April 24, 2018 | Decided: October 3, 2018

Appeal from the Marion Superior Court, No. 49G12-1601-CM-1053
The Honorable David J. Certo, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 49A05-1705-CR-978

**Opinion by Justice David**

Chief Justice Rush and Justices Massa, Slaughter, and Goff concur.

**David, Justice.**

Indiana's Constitution affords its citizens certain rights, including the right to counsel through all stages of a prosecution. That right entitles an accused to consult with counsel while in police custody. In *Pirtle v. State*, our Court relied on our State Constitution to require an advisement of rights prior to police obtaining consent to a search from a person in custody. So far, that requirement has been understood to apply only to searches of homes and vehicles. Field sobriety tests, chemical breath tests, blood draws, and cheek swabs have all been found to be searches not requiring an additional advisement of rights prior to consent. Here, we address whether our *Pirtle* requirement extends to Drug Recognition Exams ("DRE"); in other words, whether an advisement is necessary before police can obtain a person's valid consent to a DRE. We find that no advisement is required. A DRE is not the type of search that calls for a *Pirtle* advisement.

## Facts and Procedural History

On January 8, 2016, Indianapolis Metropolitan Police Department ("IMPD") officers responded to a 911 call about a dispute on the road. Monica Dycus had allegedly been following her ex-boyfriend, El-hadj Barry, who was picking up a female friend at her school. Barry's friend called 911 because Dycus was tailgating Barry's vehicle, swerving between lanes, and pulling up next to them at stoplights to shout obscenities.

When IMPD Officer Christopher Cooper ("Officer Cooper") arrived on the scene, he saw the two vehicles stopped at a red light. Dycus had one foot out of her vehicle and was observed yelling at the car in front of her. Officer Cooper approached Dycus and asked for identification. He also spoke with Barry to find out what had happened.

After checking Barry and Dycus's identification, Officer Cooper told Barry that he could leave. Officer Cooper continued to detain Dycus because he suspected that she was driving with a suspended license. While speaking with Dycus, Officer Cooper noticed an odor of marijuana

coming from Dycus's breath. Officer Cooper called for back up from Officer Christopher Winter ("Officer Winter"), an IMPD officer who was certified to conduct DREs. Officer Cooper continued to question Dycus as they waited for Officer Winter's arrival. In the course of that questioning, Dycus admitted to Officer Cooper that she had smoked marijuana with her mother "about an hour" prior to the encounter.

When Officer Winter arrived, Dycus was asked to submit to various field sobriety tests. She passed the horizontal gaze nystagmus test, which indicated that she was not under the influence of alcohol. However, Dycus failed the walk-and-turn and the one-legged stand tests. Based on the field sobriety test results, Officer Winter believed that Dycus was intoxicated. He offered to administer a certified breath test, which would test for the presence of alcohol. Dycus consented.

Officers transported Dycus to an IMPD office located approximately four miles from the initial stop to conduct the test. The results came back negative for the presence of alcohol in Dycus's system. However, while conducting the test, Officer Winter noticed a green, leafy substance in Dycus's mouth and "a green streak going down her tongue." (Tr. Vol. 2, p. 130). These signs were indicative of marijuana consumption.

Officer Winter then offered Dycus a DRE. He explained that he wanted her to submit to a DRE because her signs of impairment were not consistent with negative alcohol results. Dycus again consented. The exam took approximately thirty minutes to complete and involved a variety of measurements and observations that were assessed in a seven-category evaluation matrix, known as a "drug symptom matrix." After entering all observations and results of Dycus's DRE into the "drug symptom matrix," Officer Winter determined that Dycus was under the influence of marijuana.

Dycus consented to a blood draw, to be administered at Eskenazi Hospital. At the hospital, two vials of blood were obtained from Dycus, which were eventually sent for testing to National Medical Services, an accredited laboratory located in Pennsylvania. The lab results revealed that Dycus's blood tested positive for Delta-9 THC, an active metabolite of marijuana with psychoactive effects.

The State charged Dycus with Count I, Class A misdemeanor Operating a Vehicle While Intoxicated. Later, the State added Count II, Class C misdemeanor Operating a Vehicle with a Schedule I or II Controlled Substance or its Metabolite in the Body. At trial, Dycus objected to the admission of evidence regarding the DRE, arguing that she should have been given a *Pirtle* advisement before being asked if she consented to the exam. Dycus also argued that the admission of the chain of custody forms and shipping documents for her blood samples violated her constitutional right to confrontation. The trial court rejected both objections and Dycus was found guilty as charged. At sentencing, the trial court vacated Count II. Dycus was then sentenced to 365 days for the remaining count, with 361 days suspended to probation.

Dycus appealed, making the same arguments she made at trial: (1) that the officer's testimony regarding the DRE was inadmissible because she should have been given a *Pirtle* advisement prior to being asked to consent to the exam, and (2) that the admission of chain custody forms for toxicology documents violated her right to confrontation under the United States Constitution. The Court of Appeals found that there was no confrontation clause violation, but reversed Dycus's conviction because a *Pirtle* advisement had not been given prior to the DRE consent. *Dycus v. State*, 90 N.E.3d 1215, 1220-26 (Ind. Ct. App. 2017).

The State sought transfer, which we now grant, thereby vacating the Court of Appeals' opinion. Ind. App. Rule 58(A).

## Standard of Review

A trial court has broad discretion in ruling on admissibility of evidence. *Tuner v. State*, 953 N.E.2d 1039, 1045 (Ind. 2011). We will ordinarily disturb a trial court's admissibility rulings only where it has abused its discretion. *Id.* A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court or if it misapplies the law. *Heaton v. State*, 984 N.E.2d 614, 616 (Ind. 2013). However, where, as here, a constitutional violation is alleged, the proper

standard of appellate review is de novo.  *Speers v. State*, 999 N.E.2d 850, 852 (Ind. 2013), *cert. denied*, 134 S.Ct. 2299 (2014).

# Discussion and Decision

Today, we are asked to decide whether, prior to obtaining consent to a DRE, police must advise a person in custody of her right to consult with counsel—a question that is grounded in protections offered by our State Constitution.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects" from unreasonable searches and seizures.  U.S. Const. amend. IV. It requires police to obtain a search warrant from a neutral, detached magistrate prior to undertaking a search of either a person or private property.  *Katz v. United States*, 389 U.S. 347, 357 (1967).  However, that requirement is subject to "certain carefully drawn and well-delineated exceptions."  *Id.*  One such exception occurs when a person consents to a search; in other words, a person's valid consent eliminates the need for a search warrant.  Our State Constitution offers citizens parallel protections against unreasonable searches and seizures.  For instance, Article 1, Section 11 provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated . . . ."

Although the wording of Section 11 is almost identical to that of the Fourth Amendment, our State Constitution's search and seizure clause is given an independent interpretation and application.  *Myers v. State*, 839 N.E.2d 1146, 1153 (Ind. 2005).  In fact, Indiana's Constitution sometimes offers broader protections than those offered by the U.S. Constitution. *Conley v. State*, 972 N.E.2d 864, 879 (Ind. 2012).  Amongst those broader protections offered by our State Constitution is the requirement that, prior to obtaining consent to a search, police must explicitly advise a person in custody of her right to consult with counsel.  It is unique to Indiana and has no federal counterpart.  *See United States v. LaGrone*, 43 F.3d 332, 337 (7th Cir. 1994) ("A person in custody has no federal constitutional right to

consult with an attorney before consenting to a search of his property. However, the Indiana [C]onstitution does afford such a right.").

Whether our advisement requirement extends to a DRE—in other words, whether police are required to advise a person in custody of her right to consult with counsel before obtaining consent to perform the exam—is at issue in this case. The State asks us to affirm the trial court's determination that police need not specifically advise a person in custody of her right to consult with counsel before obtaining consent to a DRE. Dycus, on the other hand, argues that the Court of Appeals correctly held that without such advisement, evidence obtained through a DRE is inadmissible. We agree with the State and find that a *Pirtle* warning, as such advisement has come to be known, is not required to obtain valid consent to a DRE from a person in custody.

*Pirtle v. State*, (1975) 263 Ind. 16, 323 N.E.2d 634, is the seminal case for Indiana's law on consent to searches. In that case, the defendant, Robert E. Pirtle, was taken into custody for possession of a stolen vehicle. *Id.* at 22, 323 N.E.2d at 637. Police read Pirtle his *Miranda* rights twice—once in the squad car and another time at the police station. *Id.* Pirtle asked for an attorney upon the second reading of his rights. *Id.* Later, officers learned that Pirtle may have been involved in an unrelated homicide. *Id.* Approximately twelve hours after Pirtle initially invoked his right to counsel, two other officers questioned him about the unrelated homicide. *Id.* The officers, who were not aware that Pirtle had already invoked his right to counsel, asked Pirtle to consent to a search of his home. *Id.* Pirtle agreed and signed a search waiver. *Id.* When officers searched Pirtle's apartment, they found evidence linking him to the homicide. *Id.* at 22-23, 323 N.E.2d at 637.

Pirtle challenged the admission of evidence recovered as a result of the search. Our Court held that a person in police custody is entitled to the presence and advice of counsel prior to consenting to a search, and that the right, if waived, must be explicitly waived. *Id.* at 29, 323 N.E.2d at 640. Although our holding in *Pirtle* is the foundation for requiring that persons in custody be advised of their right to consult with counsel prior to consent, *Pirtle,* on its own, does not resolve our inquiry. After all, *Pirtle*

involved only the search of an apartment; searches can range widely in breadth and scope.

Since *Pirtle*, we've addressed the advisement requirement only a handful of times. In *Larkin v. State*, (1979) 271 Ind. 469, 393 N.E.2d 180—an appeal by Pirtle's accomplice following a separate trial on the same charges—we expressly reaffirmed the *Pirtle* requirement. In *Sims v. State*, (1980) 274 Ind. 495, 413 N.E.2d 556, *overruled in part on unrelated grounds by Wright v. State*, 658 N.E.2d 563, 570 (Ind. 1995), decided five years after *Pirtle*, we cleared up some ambiguity left by our earlier jurisprudence. We declared that our intention in *Pirtle* was to "recognize[] the right of those in custody to have the advice of counsel at the point where a consent to search is requested . . . ." *Id.* at 500, 413 N.E.2d at 559. Later, in *Sellmer v. State*, 842 N.E.2d 358 (Ind. 2006), we addressed *Pirtle*'s requirements in the context of a vehicle search. We found that the defendant was in custody when she was asked to consent to a search of her vehicle and, as a result, "she was entitled to a *Pirtle* advisement . . . ." *Id.* at 365.

However, *Pirtle*, *Larkin*, *Sims*, and *Sellmer* all dealt with searches of homes or vehicles. In *Garcia-Torres v. State*, 949 N.E.2d 1229 (Ind. 2011), for the first time, we addressed consent requirements for a different type of search: a cheek swab for DNA. It is worth noting that, at the time of *Garcia-Torres*, our Court of Appeals had already addressed consent to searches other than those of a home or a vehicle. In fact, our Court relied on some of those cases in its *Garcia-Torres* majority. But we had yet to weigh in on the extent of *Pirtle*'s reach beyond searches of homes and vehicles.

A threshold question in *Garcia-Torres* was whether a DNA cheek swab should be deemed a search for purposes of the Fourth Amendment and our State Constitution. *Id.* at 1232. We had already held that fingerprints were not searches, and that blood tests to check alcohol content were. *See Palmer v. State*, 679 N.E.2d 887, 892 (Ind. 1997); *see also Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Taking the range of analytical treatment in prior cases as a whole, we determined that although cheek swabs for DNA have more in common with fingerprints than they do with chemical breath tests, we could not overlook that penis

swabs for DNA testing had been deemed searches requiring their own separate probable cause proceedings. *Garcia-Torres*, 949 N.E.2d at 1237-38. Accordingly, we found that a DNA cheek swab was also a search. *Id.*

As for the central question—whether a *Pirtle* warning was required prior to consent—we noted that "*Pirtle* and the ensuing cases . . . applied this rule only to the weightiest intrusions." *Id.* at 1238. Since the various interests at stake on occasions when a *Pirtle* advisement had been required were not present, we found that we would not extend *Pirtle's* holding to cheek swabs; no advisement was required prior to consent. *Id.* at 1239.

As mentioned above, our Court of Appeals had already considered *Pirtle*'s extent several times before we decided in *Garcia-Torres* that *Pirtle* did not apply to cheek swabs. As a general matter, those cases stand for the proposition that *Pirtle* does not apply to what the court has described as minimally intrusive searches. For example, in *Wilkerson v. State*, 933 N.E.2d 891, 894 (Ind. Ct. App. 2010), the Court of Appeals held that *Pirtle* was not applicable to pat downs for weapons. The Court of Appeals also held that the purpose of the *Pirtle* would not be served by extending the doctrine to field sobriety tests, chemical breath tests, or blood draws. *See Ackerman v. State*, 774 N.E.2d 970, 979-82 (Ind. Ct. App. 2002) (finding that *Pirtle* does not apply to field sobriety tests); *Schmidt v. State*, 816 N.E.2d 925, 942-44 (Ind. Ct. App. 2004) (finding that *Pirtle* does not apply to chemical breath tests); and *Datzek v. State*, 838 N.E.2d 1149, 1158-60 (Ind. Ct. App. 2005) (finding that *Pirtle* does not apply to blood draws for blood alcohol content testing). These searches, according to the court, were much narrower, and in some cases much less intrusive, than the home and vehicle searches that require an advisement prior to consent. To the extent that Court of Appeals treats the issue with a focus on intrusiveness, we disagree. The intrusiveness of a search does not inform the need for a *Pirtle* advisement. However, we find that examining the scope and breadth of the searches helps us distinguish between the searches that require a *Pirtle* advisement and those that do not.

In deciding whether *Pirtle* advisements are necessary for a particular search, such as a DRE, we need not contemplate whether a person has a legitimate expectation of privacy, nor whether the State's intrusion was

unreasonable. After all, those questions go to whether police must obtain a warrant—a question not at issue here. Moreover, a person may freely consent to even the most unreasonable of intrusions; where such consent is valid, no warrant is required. Rather, our concern in *Pirtle*, and in the ensuing cases, was that consent to certain weighty intrusions carries a great risk of involuntariness. This is especially true, as described by the Court of Appeals in *Ackerman*, 774 N.E.2d at 981, for unlimited and general searches where police are given cart blanche to search for unspecified evidence. Searches of a home or a vehicle ordinarily require officers to specify what they are looking for and their reasons for believing that the suspect had those items in their home or in their vehicle. A person who consents to a search gives up those protections and subjects herself to a general search without probable cause. Because a person in custody may not fully appreciate the magnitude of what is at stake when authorizing police to freely search a home or a vehicle, we require police to explicitly inform persons in custody of their rights under our Constitution. Those concerns are not as strong when a search is narrowly focused.

We need not look further than *Pirtle* to find a situation where a person failed to appreciate the extent of rights he was waiving when consenting to a search. The defendant in *Pirtle* was arrested for possession of a stolen vehicle. Nothing in his initial arrest necessitated the search of his home. It wasn't until later, when police began to suspect that he had been involved in a murder, that a search of the defendant's home became of interest to police. But as our Court noted in *Pirtle*, had Pirtle refused consent to the search, officers would have had to make a showing of probable cause to a neutral, detached magistrate. *Pirtle*, 263 Ind. at 26-28, 323 N.E.2d at 639-40. Pirtle's consent to a search of his apartment exposed him to criminal liability for an unrelated murder when his arrest was for possession of a stolen vehicle—a minor crime compared to murder. We require an advisement because persons in Pirtle's circumstances rarely consent freely to an unlimited search unless fully informed of their rights and the magnitude of what they waive by consenting. Perhaps in some cases, consent is of their own free will, but, to be sure, we require an additional advisement in those circumstances that carry great risk of

involuntary consent. Such an advisement serves as a guarantee that consent is always fully informed. For other more specific searches that do not carry such risk—where the likelihood that police will come across inculpatory evidence beyond what they specifically seek is low—a *Pirtle* advisement is not necessary.

We find that a DRE is not the type of search that requires a *Pirtle* advisement. The exam consists of various field sobriety tests as well as a check of a person's blood pressure and body temperature. Officers also examine the person's arms and look into the person's mouth and nose. Parts of the procedure take place in a dark room, but the entire procedure lasts only about thirty minutes. Once the measurements are taken from the various components of the exam, the results are put into a "drug symptom matrix" which helps the officer determine whether the suspect is under the influence of a drug.

None of the components of a DRE, either individually or cumulatively, have a strong likelihood of uncovering inculpatory evidence of something other than what caused officers to conduct the DRE in the first place. Each component of the exam—the use of the oral thermometer, the examination of the mouth and nasal cavity, the check for the person's blood pressure—is narrow in scope. We do not have concerns that a person in custody will fail to appreciate the magnitude of the rights they forgo when consenting to a DRE. By conducting the DRE, officers were only going to find evidence of Dycus's intoxication—nothing more. We find that a DRE is specific enough to eliminate the risk of involuntary consent. No additional advisement is needed before a person in custody consents to a DRE.

## Conclusion

For the aforementioned reasons, we find that consent to a DRE does not require an advisement of rights under *Pirtle*. The trial court correctly determined that the evidence obtained as a result of the exam was admissible. Accordingly, we affirm Dycus's conviction.

Rush, C.J., and Massa, Slaughter, and Goff, JJ., concur.

ATTORNEYS FOR APPELLANT
Rory Gallagher
Ruth Johnson
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Andrew Kobe
Deputy Attorneys General
Indianapolis, Indiana