

FILED

Apr 03 2020, 8:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Phyllis J. Emerick
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

Tony Bethel Atkins,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 3, 2020

Court of Appeals Case No.
19A-CR-951

Appeal from the Monroe Circuit
Court

The Honorable Mary Ellen
Diekhoff, Judge

Trial Court Cause No.
53C05-1710-F1-1100

**Tavitas, Judge.**

## Case Summary

Tony Atkins appeals the trial court's grant of the State's motion to correct error regarding the trial court's earlier grant of Atkins' motion to suppress.[1] We reverse and remand.

## Issues

Atkins raises two issues, which we revise and restate as:

> I. Whether Atkins was in custody during the search of his backpack and questioning.
>
> II. Whether the search of Atkins' backpack violated his rights under the Indiana Constitution.
>
> III. Whether the questioning of Atkins violated his rights under the United States Constitution.

## Facts

On the evening of October 12, 2017, at 7:45 p.m., Darren Hsu and Mark Lambert reported to the Bloomington Police Department that two men with handguns entered their apartment and demanded marijuana. The men beat Lambert until he was unconscious and stole marijuana and electronics, including four laptops. Hsu reported that, earlier in the evening, "G" stopped by the apartment to purchase marijuana and behaved oddly. Hsu and Lambert knew "G" through Ricky Spence.

---

[1] We held oral argument in this case on March 10, 2020, at Purdue University Northwest. We thank counsel for their advocacy and extend our appreciation to Purdue University Northwest for its hospitality.

[4] The officers located Spence, and Spence reported that "G" was Glenn Williams and that Williams lived at the Town and Country Apartments. Spence reported that Williams' cousin, Atkins, was in town from Indianapolis and was with Williams on that day. At approximately 10:00 p.m., Detectives Jacob Hunter, Josh Taylor, and Baker[2] went to the apartment complex and located a vehicle with a license plate number that was registered to "Williams." The officers then observed two men leaving an apartment building and approached them. When questioned, the two men identified themselves as Williams and Atkins.

[5] Other uniformed officers arrived on the scene. Detective Hunter and Officer Fabris[3] were wearing body cameras, which captured the following events. Officers separated the two men, and Detective Hunter began talking to Atkins. Detective Hunter searched Atkins' person for weapons and found no weapons. Detective Hunter informed Atkins that they were investigating a burglary and that Atkins' "name was put out there." State's Ex. A. Atkins claimed that he had just arrived in Bloomington twenty minutes earlier from Indianapolis.

[6] Atkins was carrying a backpack, and Detective Hunter asked if the backpack contained any weapons. Atkins responded that it did not, and Detective Hunter asked if he could check the backpack. Atkins consented, and Detective Hunter said, "You can say no, request a warrant, or ask for a lawyer if you

---

[2] Detective Baker's full name is not evident in the record.

[3] Officer Fabris' full name is not evident in the record.

want." *Id.* Atkins continued to deny that he had any weapons. They went to a lighted area, and Atkins opened his backpack for Detective Hunter. The backpack contained "multiple [laptops] or electronic devices," and Detective Hunter requested to see the laptops. Tr. Vol. II p. 10. Atkins zipped the backpack and said, "Why do I got [sic] to pull my stuff out?" State's Ex. A. Atkins continued to deny that he had anything to do with the incident. Atkins said he had a "witness" to corroborate his claim that he had just arrived in Bloomington, and Atkins started to walk toward the witness. *Id.* Detective Hunter requested Atkins to come back and repeatedly told Atkins to sit down on a curb. According to Detective Hunter, it is a "fair statement" that Atkins "was not free to leave" at that point. Tr. Vol. II p. 18. After a discussion with another officer, Atkins said he needed to use the restroom, and Detective Hunter told Atkins to sit back down.

[7] Detective Hunter informed Atkins that he was investigating a burglary and that Williams was mentioned. Atkins continued to deny any involvement. Detective Hunter questioned Atkins regarding the time he arrived in Bloomington and what he had been doing. Detective Hunter again asked to see Atkins' laptops, and Atkins continued to ask why Detective Hunter needed to go through his personal items. Detective Hunter told Atkins that laptops were stolen in the robbery and repeatedly tried to convince Atkins to let Detective Hunter see the laptops, but Atkins refused. Atkins said, "Wait, so you saying, so I don't have my rights so y'all can go through my personal stuff." State's Ex.

A.  Detective Hunter responded, "Does it look like I'm going through your stuff right now." *Id.*

[8] After more refusals from Atkins, Detective Hunter walked away to talk to Williams, and Detective Baker talked to Atkins. Atkins' discussion with Detective Baker was not recorded; however, Detective Hunter's body camera was recording, and during Detective Hunter's conversation with Williams, Atkins could be heard having a loud argument with Detective Baker. Williams informed Detective Hunter that Atkins arrived in Bloomington at approximately 4:00 p.m.

[9] After approximately ten minutes, Detective Hunter returned to Atkins. Detective Baker can be heard saying to Atkins, "I get it, but when we're asking questions, you gotta, you gotta cooperate, you know what I'm saying? Because it ain't like we just gonna disappear and walk off." *Id.* Detective Baker then told Detective Hunter that Atkins claimed to have purchased the laptops shortly before the officers arrived.

[10] Detective Hunter asked Atkins, "So do you mind if I bring it over here and you can pull it out and I can just have a look at that?" *Id.* Atkins answered, "Yeah, I'll pull it out." *Id.* Atkins said that he purchased the backpack containing the three laptops for $450.00. Detective Hunter then examined the laptops, one of which had a username of Mark Lambert. At this point, the interaction between Atkins and the officers lasted almost thirty minutes. Approximately fifteen or

twenty minutes later, Atkins was handcuffed and transported to the police station.

[11] On October 18, 2017, the State charged Atkins with: (1) burglary, a Level 1 felony; (2) robbery, a Level 2 felony; and (3) armed robbery, a Level 3 felony. On August 15, 2018, Atkins filed a motion to suppress. Atkins argued that: (1) the search of his backpack violated his Fourth Amendment rights under the United States Constitution and his rights under Article 1, Section 11 of the Indiana Constitution; and (2) the interrogation violated his rights under the Fifth Amendment of the U.S. Constitution and Article 1, Section 14 of the Indiana Constitution. In particular, Atkins argued that his rights under *Pirtle v. State*, 263 Ind. 16, 323 N.E.2d 634 (1975), and *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602 (1966), were violated. Atkins requested the suppression of: (1) the evidence seized during the search of his backpack; and (2) his statements to the officers.

[12] At the suppression hearing, Atkins testified that he did not feel free to leave during the incident in the parking lot; he was not given *Miranda* warnings; he was not informed that he had the right to refuse to consent to a search of his property; and he was not informed that he had a right to an attorney. After the hearing and briefing by the parties, the trial court granted Atkins' motion to suppress on December 28, 2018. The trial court found:

> [T]he facts and analysis for the custody determination for *Miranda* are substantively the same as those made for *Pirtle*.

In conclusion, many of the factors considered by courts on the issues of *Pirtle* and *Miranda* are met in this case: Atkins' freedom of movement was curtailed when he was directed to sit on the curb after having begun to walk off; his having a continual police presence while sitting on the curb; not being accommodated when he indicated he needed to urinate; multiple requests to search were not accompanied by a *Pirtle* advisement after an advisement of a state constitutional right was really not an advisement of a right at all; and the officer's words and actions implied the possibility of arrest or detention or at the very least that Atkins was not free to go about his business. Under these circumstances, a reasonable person would believe that he "was under arrest or not free to resist the entreaties of the police." *Sellmer v. State*, 842 N.E.2d 363.

Appellant's App. Vol. II p. 65.

[13] In January 2019, the Honorable Teresa D. Harper, who granted Atkins' motion to suppress, retired; the new trial court judge recused from this case. Another trial court judge, the Honorable Mary Ellen Diekhoff, was assigned this case. On January 28, 2019, the State filed a motion to correct error. Judge Diekhoff granted the State's motion to correct error and reversed Judge Harper's order granting Atkins' motion to suppress.

[14] In determining whether Atkins was in custody and entitled to *Pirtle* and *Miranda* warnings, Judge Diekhoff considered factors identified by our Supreme Court in *Meredith v. State*, 906 N.E.2d 867, 873-74 (Ind. 2009). The trial court concluded:

Atkins' interaction with the police clearly implicates only two of the factors enunciated by the court in *Meredith*: the police

suggested Atkins should cooperate and that he was not free to go about his business. The other factors are either not present at all, or were not sufficiently shown by the defense. The defense correctly notes and, indeed, their argument repeatedly presses upon the well-established notion that the custody inquiry is holistic and based on a "totality of circumstances," rather than on a mechanical tallying of certain essential elements. However, courts regularly employ just such a tally of factors, not in blind reliance on blackletter requisites, but as an indispensable guide to objective and fair application of the law to specific circumstances. In this case, some of these factors are clearly, undeniably met, but too many are not or not certainly enough. As the court in *Meredith* was concerned to highlight, these factors are not exhaustive, exclusive, or even necessarily determinative in every case. However, given the lack of circumstances highlighted by the defense not falling within the remit of one or more of these factors, it would seem that their totality and the "totality of the circumstances" are effectively the same.

*Id.* at 100-01. The trial court also concluded that Atkins' consent to search the backpack was not the result of duress or coercion. The trial court found no violation of *Pirtle* or *Miranda* and reversed the earlier grant of Atkins' motion to suppress.

[15] Atkins filed a motion to certify the order for interlocutory appeal, which the trial court granted. This Court accepted jurisdiction over Atkins' interlocutory appeal pursuant to Indiana Appellate Rule 14(B).

# Analysis

[16] Atkins appeals the grant of the State's motion to correct error and denial of Atkins' motion to suppress the results of the search of Atkins' backpack and his

statements to the officers.  We review a trial court's ruling on a motion to correct error for an abuse of discretion.  *State v. Reinhart*, 112 N.E.3d 705, 709-10 (Ind. 2018).  "When a trial court denies a motion to suppress evidence, we necessarily review that decision 'deferentially, construing conflicting evidence in the light most favorable to the ruling.'"  *Marshall v. State*, 117 N.E.3d 1254, 1258 (Ind. 2019) (quoting *Robinson v. State*, 5 N.E.3d 362, 365 (Ind. 2014)), *cert. denied*, 140 S. Ct. 113 (2019).  We, however, consider any substantial and uncontested evidence favorable to the defendant.  *Id.*  We review the trial court's factual findings for clear error, and we decline invitations to reweigh evidence or judge witness credibility.  *Id.*  "If the trial court's decision denying 'a defendant's motion to suppress concerns the constitutionality of a search or seizure,' then it presents a legal question that we review de novo."  *Id.* (quoting *Robinson*, 5 N.E.3d at 365).

### I.  Was Atkins in Custody?

[17]     Both issues raised by Atkins require us to determine whether Atkins was in custody at the time of the search of his backpack and his statements to the officers.  As discussed in greater depth in Sections II and III, if Atkins was in custody, he was entitled to certain advisements under *Pirtle* and *Miranda*.  Atkins argues that he was in police custody, but the State argues that Atkins was the subject of a *Terry* stop, and not a custodial detention.

[18]     The custody inquiry is a mixed question of fact and law; the circumstances of the incident are matters of fact, and whether those facts add up to a custodial situation is a question of law.  *State v. Ruiz*, 123 N.E.3d 675, 679 (Ind. 2019),

*petition for cert. docketed*. "We defer to the trial court's factual findings, without reweighing the evidence; and we consider conflicting evidence most favorably to the suppression ruling." *Id.* "[W]e review de novo the legal question of whether the facts amounted to custody." *Id.*

[19] Under *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868 (1968), an officer may "stop and briefly detain a person for investigative purposes," so long as he can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Kelly v. State*, 997 N.E.2d 1045, 1051 (Ind. 2013) (internal citations omitted). "A *Terry* stop, thus, is permissible without a warrant or probable cause if the officer has reasonable suspicion to justify the stop." *Id.*

> The line between a *Terry* stop and a full-blown custodial arrest is blurred by the tension and uncertainty inherent in such encounters. *Jones v. State*, 655 N.E.2d 49, 55 (Ind. 1995). As in other areas of the law that do not rest comfortably within bright lines, we apply a "reasonableness" test: would a reasonable person, in the same situation as the defendant, believe she was free to leave? *Id.* The typical *Terry* stop is "a relatively brief encounter." *Wilson v. State*, 745 N.E.2d 789, 791 (Ind. 2001) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117, 119 S. Ct. 484, 142 L.Ed.2d 492 (1998)). An arrest, in contrast, is "the taking of a person into custody, that he may be held to answer for a crime." Ind. Code § 35-33-1-5 (2008) (emphasis added). And we have said before that "an arrest occurs when a police officer interrupts the freedom of the accused and restricts his liberty of

movement." *Sears v. State*, 668 N.E.2d 662, 667 (Ind. 1996)[4] (finding arrest when defendant was handcuffed and placed in patrol car).

*Id.* at 1051.

[20] In determining whether a defendant was in custody at the time of a search, our Supreme Court has held that custody occurs when two criteria are met: (1) the person's freedom of movement is curtailed to the degree associated with a formal arrest; and (2) the person undergoes the same inherently coercive pressures as the type of station house questioning. *Ruiz*, 123 N.E.3d at 680. "[F]reedom of movement is curtailed when a reasonable person would feel not free to terminate the interrogation and leave." *Id.*

> This freedom-of-movement inquiry requires a court to examine the totality of objective circumstances surrounding the interrogation—such as the location, duration, and character of the questioning; statements made during the questioning; the number of law-enforcement officers present; the extent of police control over the environment; the degree of physical restraint; and how the interview begins and ends.

*Id.* In *Meredith*, our Supreme Court described this test slightly differently. The Court identified a "non-exhaustive list of relevant factors" to consider in determining whether the defendant was in custody:

---

[4] Overruled on other grounds by *Scisney v. State*, 701 N.E.2d 847 (Ind. 1998).

whether the defendant was read his *Miranda* rights, handcuffed, restrained in any way, or told that he was a suspect in a crime; how vigorous was the law enforcement interrogation; whether police suggested the defendant should cooperate, implied adverse consequences for noncooperation, or suggested that the defendant was not free to go about his business; and the length of the detention.

*Meredith,* 906 N.E.2d at 874.

[21] In analyzing these factors, Atkins relies mainly upon our Supreme Court's decision in *Sellmer v. State*, 842 N.E.2d 358 (Ind. 2006), while the State relies upon *Meredith*, 906 N.E.2d 867. In *Sellmer*, officers received an anonymous tip that a car parked in front of a hair salon contained a large amount of drugs. Officers went to the salon, located the vehicle, and inside the salon, asked the owner of the vehicle to come outside. After a discussion, the owner, Sellmer, gave the officers permission to search her vehicle, which led to the discovery of a large amount of marijuana. Sellmer argued that the search of her vehicle violated the Fourth and Fifth Amendments to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. The trial court, however, denied her motion to suppress.

[22] On appeal, our Supreme Court considered, in part, whether Sellmer was in custody and entitled to a *Pirtle* advisement. The Court noted that officers asked Sellmer's permission to search three to five times before she consented; officers asked questions that, if not incriminating, "came extremely close"; officers told Sellmer that it would be in her "best interest to cooperate" and not make the

officers "jump through a bunch of hoops"; officers told Sellmer that, if no contraband was discovered, she would be allowed "to go on [her] way"; Sellmer asked a lot of questions about her rights and options and the officer responded, "It's in your best interest to cooperate and not make us jump through a bunch of hoops"; and when Sellmer asked, "Do I have to let you [search my car]?", the officer again said, "It would be in your best interest to cooperate if you have nothing to hide." *Sellmer*, 842 N.E.2d at 364-65.

[23] The Court concluded:

> [W]e apply a totality of the circumstances test in such situations and, given the extensive efforts that Officer Roberts went to here . . . to persuade Sellmer to consent and to avoid advising her that she was not required to consent even in the face of her direct questions, we conclude that a reasonable person under the same circumstances as those in which Sellmer found herself would believe either that she was under arrest or, at least, that she was not free to resist the entreaties of the police.

*Id.* at 365.

[24] In *Meredith*, our Supreme Court reached a different result. During a traffic stop, the officer noticed that Meredith smelled of alcohol, his eyes were red and bloodshot, and he was nervous. When a breath test was administered and was negative for alcohol, the officer asked to search Meredith's vehicle. Meredith agreed, which led to the discovery of cocaine. The trial court denied Meredith's motion to suppress.

[25] Our Supreme Court in *Meredith* determined that "the record reveals nothing more than a conventional traffic stop." *Meredith*, 906 N.E.2d at 874. The officer stopped Meredith for a traffic infraction; asked for Meredith's license; asked to perform a sobriety test based on his observations of Meredith; and asked for consent to search the vehicle. The Court held: "Absent anything in the record pointing the other way, '[t]reatment of this sort cannot fairly be characterized as the functional equivalent of [a] formal arrest.'" *Id.* (citation omitted). The Court concluded that Meredith was not in custody.

[26] There is no bright line rule to determine whether Atkins was merely subjected to a *Terry* stop or whether he was in custody. The State argues that Atkins was not in custody until he was handcuffed. Atkins argues that, at some point, the interaction went from a *Terry* stop to a custodial situation. After considering the totality of the circumstances and the factors identified by our Supreme Court in *Ruiz* and *Meredith*, we conclude that Atkins was in custody.

[27] Atkins and Williams were confronted in the apartment complex parking lot by multiple officers, some of whom were in uniform. The officers separated Atkins and Williams. Atkins almost immediately learned that the officers were investigating a burglary and that Atkins' name had been raised. Over the course of the interaction, the officers repeatedly told Atkins to sit on the curb, would not let him approach a "witness," and would not let him use the restroom. Although Atkins initially allowed the officers to look in his backpack to check for weapons, officers then repeatedly asked to look at the laptops in the

backpack. Atkins was agitated and repeatedly and loudly denied the officers' requests and asked about his rights.

[28] The officers also suggested Atkins should cooperate and implied adverse consequences for noncooperation. One officer told Atkins, "We got a job to do, let us get through it, the quicker you cooperate with us the quicker we get the hell outta here." State's Ex. A. Detective Baker told Atkins, "I get it, but when we're asking questions, you gotta, you gotta cooperate, you know what I'm saying? Because it ain't like we just gonna disappear and walk off." *Id.* After more than twenty minutes of argument with the officers, Atkins told Detective Baker that he had just purchased the laptops for $450.00 and allowed Detective Hunter to look at the laptops. Detective Hunter then discovered that one of the laptops belonged to Lambert based on the username. At this point, the interaction between Atkins and the officers was almost thirty minutes long. Approximately fifteen or twenty minutes later, Atkins was handcuffed and transported to the police station.

[29] Although Atkins was initially not handcuffed, he was restrained, told that he was a suspect in a crime, and was subjected to vigorous questioning about the contents of his backpack. The officers suggested that Atkins should cooperate, and Detective Hunter testified that it is a "fair statement" that Atkins "was not free to leave." Tr. Vol. II p. 18. This situation is much more like *Sellmer* than the routine traffic stop in *Meredith*. Under these circumstances, Atkins' freedom of movement was curtailed because a reasonable person would not have felt free to leave, and Atkins was subjected to inherently coercive pressures as in

*Sellmer*. Accordingly, we conclude Atkins was in custody. *See, e.g., Sellmer*, 842 N.E.2d at 365; *Ruiz*, 123 N.E.3d at 682 (holding that the defendant was in custody after detectives asked him to come to the station, detectives told him that he could leave, and detectives aggressively questioned the defendant); *State v. Janes*, 102 N.E.3d 314 (Ind. Ct. App. 2018) (holding that the defendant was in custody where, after the defendant received a verbal warning for failure to dim his lights, the officer asked incriminating questions and obtained permission to search the vehicle), *trans. denied*; *cf. Brown v. State*, 70 N.E.3d 331 (Ind. 2017) (holding that the defendant, who was detained at a field sobriety checkpoint, was not "in custody").

## II. Search of the Backpack/Pirtle Advisement

[30] Atkins argues that the search of his backpack violated his rights under Article 1, Section 11 of the Indiana Constitution because he did not voluntarily consent to the search and because he was not advised of his *Pirtle* rights prior to obtaining consent to the search.[5]

[31] The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects" from unreasonable searches and seizures. U.S. Const. Amend. IV. The Fourth Amendment requires police to obtain a search warrant from a neutral, detached

---

[5] Atkins also argues that the search of his backpack violated his rights under the Fourth Amendment. Because we conclude that Atkins' rights under the Indiana Constitution were violated, we need not address his remaining arguments under the Fourth Amendment.

magistrate prior to undertaking a search of either a person or private property. *Dycus v. State*, 108 N.E.3d 301, 304 (Ind. 2018) (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507 (1967)). The requirement for a warrant, however, is subject to exceptions, including when a person consents to a search. *Id.*

[32] "Our State Constitution offers citizens parallel protections against unreasonable searches and seizures." *Dycus*, 108 N.E.3d at 304. Article 1, Section 11 provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated . . . ." "Although the wording of Section 11 is almost identical to that of the Fourth Amendment, our State Constitution's search and seizure clause is given an independent interpretation and application." *Id.* Indiana's Constitution sometimes offers broader protections than those offered by the United States Constitution. *Id.* "Amongst those broader protections offered by our State Constitution is the requirement that, prior to obtaining consent to a search, police must explicitly advise a person in custody of [his] right to consult with counsel." *Id.* Specifically, our Supreme Court held in *Pirtle* that "a person in police custody is entitled to the presence and advice of counsel prior to consenting to a search, and that the right, if waived, must be explicitly waived." *Id.* at 305. This requirement "is unique to Indiana and has no federal counterpart." *Id.* at 304.

[33]     We have concluded that Atkins was in custody during the search of the laptop in his backpack.[6] *See supra* Section I.  Accordingly, we conclude that Atkins was in custody and was entitled to a *Pirtle* advisement prior to the search of the laptop in his backpack.  Atkins argues that he was not given a *Pirtle* advisement prior to the search of the laptop in his backpack, but the State does not address the argument.  It is undisputed that Atkins was not given a *Pirtle* advisement before the search of the laptop in his backpack when he was in custody.

[34]     Earlier in the interaction, when Detective Hunter asked if Atkins had any weapons in his backpack, Detective Hunter said, "You can say no, request a warrant, or ask for a lawyer if you want."  State's Ex. A.  Atkins, however, was not in custody at that time.  Even if this statement applies to the later search of Atkins' backpack, Detective Hunter's statement fails to explicitly inform Atkins that he was entitled to the presence and advice of counsel prior to consenting to the search, and the statement fails to comply with the *Pirtle* advisement requirement for a person in custody.  *See Dycus*, 108 N.E.3d at 304 ("[P]rior to obtaining consent to a search, police must *explicitly* advise a person in custody of her right to consult with counsel.") (emphasis added).

[35]     Because Atkins did not receive a *Pirtle* warning prior to the search of the laptop in his backpack and was entitled to one and did not explicitly waive his right to

---

[6] During the oral argument, Atkins would not concede that the officer had reasonable suspicion to stop Atkins.  There is, however, no argument in Appellant's Brief that the search of the backpack for weapons was improper and no argument that the search of the backpack for weapons required a *Pirtle* advisement.

counsel prior to the search, the trial court erred by granting the State's motion to correct error and reversing the earlier grant of Atkins' motion to suppress the evidence obtained as a result of the search. *See, e.g., Sellmer*, 842 N.E.2d at 365 (reversing the denial of Sellmer's motion to suppress where Sellmer was in custody and was entitled to a *Pirtle* advisement, which she was not provided).

### III. *Suppression of Statements/Miranda Advisement*

Atkins also argues that the trial court erred by denying his motion to suppress statements that he made to the officers pursuant to the Fifth Amendment of the United States Constitution.[7] The Fifth Amendment, incorporated to the states via the Fourteenth Amendment, guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *Kelly*, 997 N.E.2d at 1053. The United States Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602 (1966), that, before a law enforcement officer may subject someone to custodial interrogation, the officer must advise him "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Kelly*, 997 N.E.2d at 1053. "If the officer does not so advise the subject, the prosecutor cannot use any statements the subject does make against him in court." *Id.* "The trigger to

---

[7] Atkins also argues that his statements were inadmissible under Article 1, Section 14 of the Indiana Constitution. Because we conclude that Atkins' rights under the Fifth Amendment were violated, we need not address his remaining arguments under the Indiana Constitution.

require the announcement of *Miranda* rights is custodial interrogation." *State v. Brown*, 70 N.E.3d 331, 335 (Ind. 2017)

[37] We have determined that Atkins was in custody. *See supra* Section I. As such, Atkins was entitled to an advisement of his *Miranda* rights prior to the police questioning him, which he did not receive. The trial court erred by granting the State's motion to correct error and reversing the earlier grant of Atkins' motion to suppress his statements to the police.

## Conclusion

[38] The trial court erred when it found that Atkins was not in custody and was not entitled to *Pirtle* and *Miranda* advisements. Accordingly, the trial court erred by granting the State's motion to correct error and by reversing the earlier grant of Atkins' motion to suppress. We reverse and remand.

[39] Reversed and remanded.

Pyle, J., and Altice, J., concur.